DAVID T. WILENTZ, Attorney-General of the State of New Jersey, informant-respondent,

*v.*

ROBERT C. HENDRICKSON, State Treasurer, defendant-appellant.

[Decided June 22d, 1944.]

Mr. *Herbert J. Hannoch* (Mr. *Josiah Stryker,* Mr. *J. H. Thayer Martin* and Mr. *T. Millett Hand,* of counsel), for the appellant.

Mr. *David T. Wilentz* (Mr. *Joseph Lanigan,* Mr. *Milton B. Conford* and Mr. *Joseph Weintraub,* of counsel), for the respondent.

The opinion of the court was delivered by

PERSKIE, J.

The basic question for decision is whether the remission of the accrued and unpaid interest, on the full principal amount of the delinquent property taxes upon private railroad companies operating in this state, as authorized by the inter-related statutes (*P. L. 1941 ch. 290,* as amended and supplemented by *P. L. 1942 ch. 241*), contravenes article I, paragraph 20, of our state constitution which provides:

"No donation of land or appropriation of money shall be made by the State or any municipal corporation to or for the use of any society, association or corporation whatever." (As added, Election September 7th, 1875, Proclamation, September 28th, 1875.)

A few prefatory words as to the parties are desirable. In form, this is a suit between two of our high state officials, the Attorney-General and the State Treasurer, each appearing in a representative capacity. The status of neither is questioned. The Attorney-General, "acting in behalf of the people of the state" filed an information challenging the constitutionality of the two statutes, *supra,* and the State Treasurer defends their constitutionality, with the aid of counsel, at the expense of the state, as "authorized and directed" by *P. L. 1941 ch. 391 p. 1012.* In substance, the actual parties affected by this suit are the people of the state, on the one side, and the private railroad taxpayers, on the other. With this in mind we turn to the consideration and determination of the merits of this case as submitted.

Pursuant to the then applicable Railroad Tax Law (*R. S. 54:19-1, et seq.,* which has for its source *P. L. 1888 ch. 208,* as amended and supplemented), many private companies, owning and operating either a railroad system, or a railroad not a part of a system, in this state, were delinquent, on December 1st, 1940, in the payment of their taxes for the years of 1932 to 1940, inclusive. The delinquencies totaled a sum of at least $34,358,949.40 principal and, in addition thereto, a sum of at least $24,130,085.34 for the statutory rate of "interest" on the delinquent principal of "one per

cent. for each month until paid." *R. S. 54:27–4.* The accuracy of the stated figures is not in issue. It depends— we are told—upon the determination of the contrary views of the parties as to whether payments on account of arrears shall first 'be credited to principal or to interest. By stipulation that question was reserved.

The sizable amount of these interest delinquencies, the steadfast adherence by these private railroad companies, with few exceptions, to their continuous withholding and contesting of the payment of their taxes when due to the state (*Central Railroad Co.* v. *Thayer Martin, 114 N. J. Law 69, 73; 175 Atl. Rep. 637*) quite naturally engendered great concern on the part of those of the public in interest. That concern found expression alike by former Governors of this state, representatives of the major political parties, by private and legislative committees and others.

Suffice it to observe here that this concern ultimately found legislative expression by the enactment of *P. L. 1941 ch. 290 p. 768.* Generally stated, this statute provides for installment payments and acceptances thereof, over a fixed number of years, of the full principal amount of the delinquent taxes due and owing by the private railroad companies on December 1st, 1940, and remaining unpaid on the effective date of the statute (July 22d, 1941), but without the payment of the delinquent "interest" of over $24,000,000. It is interesting at this point to mark the fact that for the first time our legislature, adopting a new nomenclature, denominated or characterized such delinquent interest as "interest penalties," and provided for their "remission." The legislature set down in the preamble to the statute the facts that motivated the challenged legislation. They are, in substance, that four railroad systems in the state are or have been recently in reorganization under the federal bankruptcy laws and that there was "doubt" as to the "ability of railroads to pay the delinquent taxes" and "at the same time to continue to furnish adequate and safe service;" that "immediate payment" of the accumulated tax delinquencies would "impair the capacity" of the delinquent railroads to furnish efficient transportation service to meet the demands of the "industrial

development" of the state especially because of the present demands of production for national defense; and that the delinquencies "have tended" to create chaotic conditions in state and municipal finances, and that the state has an urgent interest in the immediate solution of the problem "in the maintenance" of "stable transportation facilities and public finances."

A brief statement of the more important developments in the progress of this case will help more clearly to lay bare the posed question requiring decision.

Conceiving the statute thus enacted (*P. L. 1941 ch. 290*) to be unconstitutional, Mr. David Wilentz, the then Attorney-General, acting on behalf of the people of the state, filed an information in our Court of Chancery, on September 3d, 1941, alleging, among other grounds, that the statute was unconstitutional in that it contravened article I, paragraph 20, of our state constitution. He prayed that the statute be declared invalid and that the State Treasurer, his agents and servants, be restrained from carrying out or executing any and all of its provisions. The right to the relief sought was disputed by the then State Treasurer and thereafter by his successors.

On May 21st, 1942, Vice-Chancellor Jayne granted a rule to show cause with *ad interim* restraint in accordance with the prayers for relief.

On the very same day (May 21st, 1942) the legislature amended and supplemented *P. L. 1941 ch. 290,* by *P. L. 1942 ch. 241.* A reading of the latter statute clearly indicates that it is the handiwork of capable counsel, drafted and directed to the single end of further buttressing the objectives sought to be attained by *P. L. 1941 ch. 290,* in light of the attack made upon its constitutionality. It amends the title of the act to include the remission of the unpaid interest (continued to be called penalties), it emphasizes the waiver of the right to contest the legality of any assessment on railroad property for the years therein stated, it re-states the objectives of the act in some twelve paragraphs under section 15 thereof. These paragraphs are in the nature an historical resume of the circumstances—some of which have already

been noted—leading up to the passage of the challenged statute, and conclude with the statement that the delinquent tax problem "can best be disposed of" and the "unpaid" balance "can best and most quickly be collected" in the manner provided by the statute and that "upon the acceptance and compliance with such terms and conditions by any railroad taxpayer the state will have received *full, fair and adequate consideration* and the best interests of the state will have been served and furthered." (Italics supplied.)

After due consideration of the merits of the order to show cause with the *ad interim* restraint granted, based upon the affidavits and exhibits attached thereto, argument and briefs of the respective parties, Vice-Chancellor Jayne answered the posed question in the affirmative. His answer was based upon the findings, in substance, that the delinquent interest was not, in the circumstances exhibited, a penalty but rather was it compensation which together with the unpaid principal taxes should, as it did, "merge and constitute" the "debt" owing by each railroad company to the state, that the remission of that debt, *i. e.,* the delinquent interest, was not supported by either a legal, equitable or moral consideration and hence the remission thereof was an indirect appropriation of public funds to a private corporation prohibited by article I, paragraph 20, of our state constitution. In reaching that result, Vice-Chancellor Jayne concedes that the holding in the case of *In re Voorhees, 123 N. J. Eq. 142; 196 Atl. Rep. 365;* affirmed by our Supreme Court, *121 N. J. Law 594; 3 Atl. Rep. (2d) 891;* affirmed by this court, *124 N. J. Law 35; 10 Atl. Rep. (2d) 650,* was "exceedingly influential." See his comprehensive opinion in which is set down the facts, a detailed analysis of the statutes, the respective contentions, and the controlling law upon which he based his result. *Wilentz* v. *Hendrickson, 133 N. J. Eq. 447; 33 Atl. Rep. (2d) 366.*

Accordingly, the Vice-Chancellor advised an order (July 27th, 1943) which was entered decreeing that *P. L. 1941 ch. 290* and *P. L. 1942 ch. 241* were invalid, and restraining and enjoining the State Treasurer, his successors, agents and servants, until final hearing of the case, from carrying out or

executing any and all provisions of the statutes. An appeal was taken from the preliminary injunction, but it was not prosecuted because (so we are told) the appeal from the final decree "disposes of all issues involved."

On final hearing the parties submitted the cause to the Vice-Chancellor on a stipulation which, among other things, provided that:

"1. The several affidavits and exhibits attached thereto which were filed by the informant and by the defendant in support of their respective positions on the argument of the order to show cause why the temporary restraint should not be continued, shall be offered and received in evidence on final hearing with the same force and effect as though the several affiants had testified in person exactly as in said affidavits."

Vice-Chancellor Jayne adhered to the views which he had already expressed as his final opinion. He advised a final decree which was entered on September 28th, 1943, in and by which it is finally decreed that *P. L. 1941 ch. 290* and *P. L. 1942 ch. 241* are in contravention of article I, paragraph 20, of our state constitution, that they are null and void, and that all actions thereunder be restrained.

The State Treasurer appeals.

New Jersey was among the very first of the states of the Union to recognize the right of our courts, with proper regard and respect for the action of the co-ordinate branches of our government, to strike down legislation that contravenes the constitution, the fundamental law of our state. That right was first exercised in 1780 by our Supreme Court in the case of *Holmes* v. *Walton, 4 Historical Review 456; Wambaugh Cases on Constitutional Law, Book 1, p. 21.* It was next exercised in 1802 in the case of *State* v. *Parkhurst,* published in the appendix to *9 N. J. Law 427, 443, et seq.* (See footnote at *p. 434* as to its affirmance by the Court of Errors and Appeals.) In the Supreme Court of the United States, it was first recognized in the case of *Marbury* v. *Madison, 1 Cranch \*137; 2 L. Ed. 60.* And that right has ever since been exercised by all of our state and federal courts when properly invoked.

Proper regard and respect for the legislative branch requires, among other things, that courts should not act as censor of the reasonableness or wisdom of legislative enactments (*Douglass* v. *Chosen Freeholders of Essex County, 38 N. J. Law 214, 216*); that no statute shall be declared void if its "unconstitutionality is in anywise doubtful" (*Attorney-General* v. *McGuinness, 78 N. J. Law 346, 371, et seq.; 75 Atl. Rep. 455*), or if there be "permissible doubt" as to the existence of the constitutional limitation invoked against the validity thereof, *Attorney-General* v. *McGuinness, supra; State Board of Milk Control* v. *Newark Milk Co., 118 N. J. Eq. 504; 179 Atl. Rep. 116;* and that courts resort to the permissible rule of practical contemporaneous construction, to which we give great but not necessarily conclusive weight to sustain the constitutionality of a statute, but only if doubt exists as to the proper construction of a statute or of the construction or application of the constitutional provision invoked. *Cf. State* v. *Wrightson, 56 N. J. Law 126, 213; 28 Atl. Rep. 56; 22 L. R. A. 548* (words used are if the "language be obscure or doubtful"); *Commonwealth Roofing Co.* v. *Riccio, 81 N. J. Eq. 486,* and cases collated (at *p. 489*); *87 Atl. Rep. 114* (words used are whenever there is a "debatable question").

Thus in the exercise of our undisputed right, historically imbedded in our jurisprudence to declare a statute unconstitutional, and with proper regard for the self imposed limitations looking toward favoring the constitutionality of legislation, and deeply sensible of the respect and regard which we entertain for our co-ordinate branches of our government, we find that we entertain no doubt as to the unconstitutionality of the challenged statutes.

We, as judges, must not be "blind to see" and "shut our minds to truths" that "all others can see and understand." (*Per* Chief-Justice Taft in the *Child Labor Case, 259 U. S. 20; 66 L. Ed. 817, 819,* and *per* Mr. Justice Cardozo, while judge of the Court of Appeals of New York, in the case of *McGovern* v. *City of New York, 234 N. Y. 377; 138 N. E. Rep. 26, 32.*)

The precise and unanswerable truths are that by the legis-

lative authorization for the remission, cancellation and abatement of the delinquent interest, the legislature intended that the state should forgive or remit to the private railroad companies over $24,000,000 of the peoples' money, and this—as was admitted on the argument at the bar of this court—without proof that this debt was not collectible. No words, no rules of construction, can alter these truths; they are crystal clear.

In the case of *Lohen* v. *Thompson, 88 N. J. Law 40; 95 Atl. Rep. 447,* the late Mr. Justice Swayze stated the rule as follows (at *p. 42*) : "* * * the constitutionality of an act of the legislature is not to be determined by a consideration of verbal or rhetorical niceties; the act must be judged on a broader basis, and according to its effect as a whole."

That is a sound rule of judicial review to determine the constitutionality of a statute. For it aims to ascertain the true intent of the legislature. That is the rule we here employ. When so employed, neither the use for the first time, of the words "unpaid interest penalties" instead of the words "interest" or "delinquent interest," nor the failure to use words directly stating an "appropriation of money," can support the claim made that the legislature made no appropriation of money in the challenged statutes within the meaning of the constitutional limitation of article I, paragraph 20. For whether the delinquent interest be denominated a "financial obligation" which is in fact "nullified" (*In re Voorhees, supra*), or whether it be denominated as a "pecuniary burden" which is in fact "released" (*Jersey City* v. *North Jersey Street Railway Co., 78 N. J. Law 72; 73 Atl. Rep. 609*), or whether it be denominated by its true, statutory name, a tax debt, which is in fact remitted, canceled and abated, there is no difference in principle and none in fact. *Jersey City* v. *North Jersey Street Railway Co., supra* (at *p. 74*). What the legislature may not constitutionally do directly it may not do indirectly. *In re Voorhees, supra.* For the end result is the same in each instance. The people's treasury becomes depleted to the extent involved just as effectively as if such a sum were actually paid out. Therein lies the congenital infirmity in the challenged statutes and that is their clear

and unquestionable evil. With equal clearness and freedom from doubt there exists the constitutional limitation (article I, paragraph 20), as it has existed since 1875, to remedy, to strike down the recurring evils which gave it birth and are here present. There is no basis for any "permissible doubt" as to its meaning and application. *In re Voorhees, supra*.

Since we are free from any doubt as to the meaning and effect of the challenged statutes, and as to the existence, meaning and effect of the constitutional limitation, there is no occasion, under the applicable rule of law, to resort to the rule of practical construction. Moreover, the statutes cited as having been sustained before and after the adoption of article I, paragraph 20, *supra*, are clearly distinguishable. None presents the issue here involved. It should suffice to observe that those statutes, without detailing their provisions, are so clearly different in principle, so factually at variance with the circumstances which existed and motivated the enactment of the presently challenged but unambiguous statutes, that they utterly fail to support the applicability or analogy attributed to them. Obviously if the validity of those statutes were to be accepted as indicative of the meaning and application of the constitutional limitation (article I, paragraph 20) in the case at hand, then it would be within the power of the legislature, in the circumstances exhibited, to forgive part of the principal tax as well as the statutory interest thereon, a component part of the principal tax. There is no such power. *In re Voorhees, supra*. That is not seriously questioned, if not outrightly admitted.

In light of our freedom from doubt in the premises, and in light of our approval of the construction given to article I, paragraph 20, in the *Voorhees Case*, the rule of practical contemporaneous construction is without application.

Thus if the state has a vested right in and to the tax debt (delinquent interest), then unless the remission, cancellation and abatement of that right is supported by a "legal, equitable or moral consideration" (*In re Voorhees, supra*), the challenged statutes clearly contravene, in spirit and in fact, the constitutional limitation (article I, paragraph 20) invoked.

Does the state have a vested interest in and to the accrued,

unpaid and delinquent interest? The learned Vice-Chancellor answered this question in the affirmative. We are entirely satisfied that the proofs and authorities upon which he relied fully support his answer.

We adopt his reasoning on this phase of the question before us and pause only to note that the cases of *Town of Belvidere* v. *Warren Railroad Co.* (*Supreme Court, 1869 or 1870*), *34 N. J. Law 193;* affirmed in substance but dismissed on a procedural ground, *35 N. J. Law 584;* *Dixon* v. *Jersey City* (*Supreme Court, 1873*), *37 N. J. Law 39; Pennsylvania, &c., Terminal Co.* v. *Gummere* (*Supreme Court, 1915*), *87 N. J. Law 353; 95 Atl. Rep. 134,* and *Burlington County* v. *Martin, 129 N. J. Law 92; 28 Atl. Rep.* (*2d*) *116,* are not in conflict with that reasoning or with the result reached. For in the first place the decision in both the *Belvidere* and *Dixon Cases* antedated the enactment of the constitutional provision here under discussion, which provision was not mentioned or in issue in the *Pennsylvania Terminal Co. Case.* And in the *Burlington County Case* our affirmance was made to rest on the sole ground that the discretionary writ of *mandamus* will ordinarily not be awarded, when such an award will create disorder or confusion.

In the second place all of these cases involve the construction of a statute concerning the commission of a crime, or the construction of a statute otherwise essentially penal. (*Cf. R. S. 1:1–15* as to the effect of offenses, &c., incurred under repealed acts.) No such statute is here involved.

A reading of the *Belvidere Case* makes clear (at *p. 199*) that it was decided on the holding in the cases of *Commonwealth* v. *Duane, 1 Binn. 601* (*1804*); *Yeaton* v. *United States, 5 Cranch 281*; *3 L. Ed. 101* (*1809*), and *Norris* v. *Crocker, 14 How. 429; 14 L. Ed. 210* (*1851*).

The first case involved a Pennsylvania statute under which defendant was convicted for libel and pending appeal a statute was passed prohibiting such a prosecution. The second case involved an Act of Congress prohibiting intercourse with certain ports. Pending appeal from the sentence of condemnation of the schooner involved, the act expired by reason of its own limitation. And the third case involved a suit for

a penalty under an Act of Congress concerning fugitives from justice and persons escaping from the services of their master. The applicable section of the act was repealed pending suit. Those cases held, as was pointed out in *Town of Belvidere* v. *Warren Railroad Co., supra* (at *p. 199*), that the "repeal of a penal statute puts an end to all prosecution under it. *Sedg. on Stat. Const. Law 129*," and that the "repeal of a law imposing a penalty, although after conviction, arrests the judgment."

The philosophy for the rule underlying the holding in these cases and urged upon us in the instant case, finds perfect expression in the case of *Commonwealth* v. *Duane, supra,* where the court held (at *p. 609*), "In nothing is the common law, which we have inherited from our ancestors, more conspicuous than its mild and merciful intendments towards those who are the objects of punishment." The effect of this rule is that it "takes away punishment" whether it arises under a statute concerning crime or a statute otherwise essentially penal. It operates, in the opinion of Mr. Justice Van Syckel in the *Dixon Case, supra* (at *p. 42*), "like a full pardon which releases the punishment and extinguishes the guilt."

The rationale of a holding as to a statute concerning a crime, or to a statute otherwise essentially penal cannot be applied to the applicable tax statute (*R. S. 54:19–1, et seq.*), or to the issue here involved. Surely that statute is not a statute concerning crime! Nor is it a penal statute. *Cf. Huntington* v. *Attrill, 146 U. S. 657, 669; 36 L. Ed. 1123, 1126; New York* v. *Coe Manufacturing Co., 112 N. J. Law 536, 538; 172 Atl. Rep. 196; cer. den., 293 U. S. 576; 79 L. Ed. 764; Erie Elevator Co.* v. *Jersey City, 83 N. J. Eq. 71, 75; 90 Atl. Rep. 8; affirmed, 84 N. J. Eq. 176; 92 Atl. Rep. 599; Beasley* v. *Gottlieb, 131 N. J. Law 117; 35 Atl. Rep. (2d) 49.* Nor is a delinquent taxpayer a criminal wrongdoer. Interest is neither denominated as a penalty in the statute nor is it here a penalty in fact. Appellant lays hold of the expression in the *Belvidere Case* (at *p. 198*) that interest is a "pain denounced for delinquency." Denouncement however strong is not the determinative. The true

determinatives are whether under all the circumstances exhibited in each case presented, considered and determined, the interest exacted is reasonable or arbitrary; whether it is compensation for the use of the money due to the state and for the costs necessarily incurred in the enforcement of its payment (*Meilink* v. *Unemployment Reserves Commission, 314 U. S. 564, 567; 86 L. Ed. 458, 461*), or whether it is merely a penal exaction. True it is that in a sense the payment of interest is not without some "pain" but it is equally true that it is rather a common "pain" suffered by all delinquents. This does not, however, establish that it is not interest and is a penalty. Nor does the fact that the rate of interest imposed may lessen the temptation to defer payment as an economic advantage (it had no such effect here) establish that it is not interest. The statute fixes the quality of the interest charge; and we are not at liberty to make an essential distinction not found in the legislative expression. The interest, as it accrues, merges in what the statute itself denominates a "debt" due the state. The accrued interest is annexed to the "debt" so as to constitute it an integrated part of the whole. The whole thus is the "debt due from the company to the state  *  *  *  for which an action at law or suit in equity may be maintained, and shall be a preferred debt in case of insolvency." *R. S. 54:27–4.* There is neither proof that the interest, the component, the integrated part of the tax debt is unreasonable or arbitrary nor, as already observed, that it was not collectible.

We are satisfied therefore, that in the circumstances exhibited and the law applicable thereto, that the interest was compensatory and not penal, and that the state had a vested right in and to that interest, and that this interest, together with the principal taxes, constituted the tax debt due from each of the private railroad companies to the state.

Is the remission, cancellation and abatement of the tax debt (delinquent interest) supported by a legal, equitable or moral consideration? The learned Vice-Chancellor answered that question in the negative. Here, too, we are entirely satisfied that the proofs and authorities upon which he relied support his answer.

Proper regard and respect for legislative declarations set down in support of its enactments are not breached where the existence and resultant consequences of such declarations are judicially determined. For such a determination does not comprehend the policy or the wisdom of the legislation; it comprehends only the constitutional power of the legislature to enact the challenged legislation. The common and proper exercise of this judicial function is not open to debate. Reference to a few of the endless number of many illustrative cases should suffice. *Cf. Norman* v. *Baltimore and Ohio Railroad Co., 294 U. S. 240; 79 L. Ed. 885* (gold cases) ; *Nebbia* v. *New York, 291 U. S. 502; 78 L. Ed. 940* (business (milk) with a public interest) ; *New Jersey Suburban Water Co.* v. *Board of Public Utility Commissioners, 123 N. J. Law 303; 8 Atl. Rep. (2d) 350; cer. den., 309 U. S. 663; 84 L. Ed. 1010; McGregor, Receiver,* v. *Board of Public Utility Commissioners* (utility rates) ; *Home Fuel Oil Co.* v. *Glen Rock, 118 N. J. Law 340, 345; 192 Atl. Rep. 516* (zoning) ; *Regal Oil Co.* v. *State, 123 N. J. Law 456; 10 Atl. Rep. (2d) 495* (police power).

Appellant concedes that if a "fictitious consideration" were declared or "mentioned," the validity of the challenged acts could not be sustained if their purpose was to make an appropriation of public funds to private corporations. If that be so, and it clearly is so, the adequacy of the consideration is in the circumstances a proper subject for review by the court. In the case of *McGovern* v. *City of New York (1933), supra,* the contractors asserted the existence of a contract by which the City of New York, acting through the Public Service Commission and the Board of Estimate and Apportionment, undertook to pay them the costs incurred through the advance in the price of labor and material as a consequence of the war. The validity of that contract was challenged on the ground that it violated article 3, section 28, of the constitution of the State of New York prohibiting any city to grant extra compensation to any public officer, servant, agent or contractor. The asserted consideration was the surrender of a right, namely, the contractors paid the wages that were necessary to keep the work in motion, and avert the disrup-

tion and suspension of work as the result of a protracted strike. In the unanimous opinion of the Court of Appeals of New York, written by that scholarly jurist, the late Mr. Justice Cardozo, the asserted right was analyzed and found to be "illusory." Said the late justice, "Millions were promised by the city in return for an unreal surrender. Either there was no consideration at all, or the shred of value, if any, is so grossly disproportionate to the return that to uphold it as sufficient would be to nullify the constitution by subterfuge and fiction." That lays to rest all questions as to the judicial function in considering and determining the issue here present. The cases of *Morris and Essex Railroad Co.* v. *Newark, 76 N. J. Law 555; 70 Atl. Rep. 194; Borough of Runnemede* v. *The New Jersey Water Co., 123 N. J. Law 383; 8 Atl. Rep. (2d) 576,* are not to the contrary. While it is true that the court did say that neither an "adequate or only partial consideration" could be the subject of "inquiry here, *i. e.,* in the first case, and that the "adequacy" of the consideration could not be determined "in the issue" in the second case, it clearly appears that the court, in both cases, considered the question of consideration and determined that there was "a valuable" consideration in each case.

Let us briefly analyze this asserted "substantial and valuable consideration" which the state is purported to receive for the remission, cancellation and abatement of this sum in excess of $24,000,000 in interest (tax debt) due from the railroad taxpayers. Chiefly, it is to receive a waiver from the railroad taxpayers of all their rights to contest the legality of the amount of any assessment on their property used for railroad purposes made prior to December 1st, 1941, pursuant to the applicable tax acts and to like assessments made for 1941, and it is also to receive written consents to the discontinuance and dismissals of any and all proceedings pending respecting any such assessments.

1931 to 1936. It would be interesting but altogether too long to detail the various unsuccessful appeals that the railroad taxpayers prosecuted in both our state and federal courts to set aside the assessments made on their properties. Compare for the common pattern of attack, *Central Railroad Co.*

v. *State Tax Department, 112 N. J. Law 5; 169 Atl. Rep. 489; cer. den., 293 U. S. 568; 79 L. Ed. 667; Central Railroad Co. v. Martin, 114 N. J. Law 69; 175 Atl. Rep. 637; Central Railroad Co. v. Martin, 115 Fed. Rep. (2d) 968,* decided November 27th, 1940, rehearing denied January 24th, 1941, *cer. den.* April 28th, 1941, *313 U. S. 568; 85 L. Ed. 1527.* The results of that denial are obvious. The railroad taxpayer had nothing to waive as to these years, and the pattern of their attack was definitely made inefficacious. 1937 and 1938.

The railroad taxpayers' appeals for these years, substantially based upon the same inefficacious pattern of attack, were decided adversely to them on May 13th, 1941. State Board of Tax Appeals—*Central Railroad Company of New Jersey* v. *Martin, 19 N. J. Mis. R. 427; 20 Atl. Rep. (2d) 330.* That determination was not contested. The time for contest (three months, *R. S. 54:26–11*) had expired when *P. L. 1942 ch. 241* was enacted. As to the reasonableness of the time limitation, see *Cook* v. *Allendale, 79 N. J. Law 285,* and cases there collated, *75 Atl. Rep. 769.*

1939. The railroad taxpayers appealed to the State Board of Tax Appeals and the City of Jersey City filed a cross appeal. See *State Board of Tax Appeals—Jersey City* v. *Martin, 20 N. J. Mis. R. 283; 26 Atl. Rep. (2d) 733.* The appeal of the railroad taxpayers was dismissed without opinion on June 2d, 1942. There has been no contest as to that judgment.

1940–1941. The railroad taxpayers appealed to the State Board of Tax Appeals. No hearing has been held on these cases. The affidavit of the Attorney-General discloses that the fundamental methods of valuation used in making the valuations of the railroad taxpayers' properties for the years 1937 to 1941, inclusive, were substantially the same as those which had been used by the State Tax Commissioner and his predecessors for over forty years theretofore and particularly the methods which were used for the years 1931 to 1936 and which were sustained. As pointed out for respondent, the State Tax Commissioner made substantial reductions to the railroad taxpayers for the years 1939 to 1941 although

these railroads have during that period enjoyed and are now "enjoying revenues and earnings to heights approaching previous all-time highs (and) which have since been outstripped." Using the 1933 assessments as stated in *114 N. J. Law 69, 70,* the following is disclosed:

| Name of System | 1933 Valuation | 1941 Valuation |
|---|---|---|
| C. R. R. of N. J. | $102,351,077 | $67,742,634 |
| Lehigh Valley R. R. | 45,694,813 | 36,495,060 |
| D., L. & W. R. R. | 85,386,862 | 56,298,424 |
| Erie Railroad | 50,136,198 | 39,719,523 |
| N. Y. Central R. R. | 30,010,862 | 22,613,734 |

In light of these facts, in light of the lack of any new issues involved, and in light of the fact that there is no proof that the debt is not collectible, it becomes altogether clear that the asserted rights of the railroad taxpayers are "illusory" rather than real. The consideration, if any, is "so grossly disproportionate" to the price (over $24,000,000) that to uphold it as a legal consideration between the parties here involved and in the circumstances exhibited would be to nullify article I, paragraph 20, of our state constitution "by subterfuge and fiction." No word or act of this court shall contribute to such a result.

Nor do we find anything in the proofs to support a moral or equitable consideration. There is nothing to indicate that the railroad taxpayers rendered any service past or present other than such services as each private railroad company was and had been rendering in operating pursuant to its franchise from the state. Such services invoke neither a moral nor an equitable consideration. Whether such operation is successful or unsuccessful, the taxes due to the state had not ceased and do not cease to be a "lien paramount to all other liens upon all the lands and tangible property and franchises" of each of these companies. *R. S. 54:27–4.* There is no proof that the market value of these assets is less than the taxes due thereon. There is proof that throughout the period from 1930 through 1941 every railroad taxpayer had "more than enough money available," after the payment of "railway operating expenses," fully and timely to pay its tax obligation. With few exceptions, they chose otherwise to apply this money. They ignored the priority of their tax obligation.

They chose persistently and consistently to resist their payment year after year until the total tax debt (principal and interest) has reached the sum of about sixty million dollars, or more. They may not now capitalize upon a situation which they voluntarily created however painful it may now be. The legislature may not alleviate such pain with the people's money.

We have carefully considered all other points argued and find that they require no further discussion.

For the reasons here stated and for those stated by the learned Vice-Chancellor not inconsistent herewith, the decree is affirmed, without costs.

CASE, J.   (Dissenting.)

On December 1st, 1940, taxes upon property used for railroad purposes, accumulating since and including 1932, were delinquent and unpaid in an amount approximating $34,000,-000.   Interest penalties thereon amounted to an additional $24,000,000.   The legislature authorized an adjustment which, if carried out, would, briefly, result in the payment of the $34,000,000 unpaid taxes and the waiver of the $24,000,000 interest penalties.   The authorizing legislation was in *chapter 290, P. L. 1941,* and *chapter 241, P. L. 1942.* The validity of those statutes is now in dispute.   The one substantial issue is whether the waiver of the $24,000,000 interest penalties constituted a gift to the railroads in violation of article I, paragraph 20, of the state constitution, which provides that "No donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever."   That was the only point considered by the court below.   All other points *contra* the validity of the statutes appear to me either to be incidental to and governed by it or to be specious and strained.   Upon two grounds, either of which is sufficient in itself, I am of the opinion that the waiver was not a gift.   Those grounds are, first, that there was valid consideration for the waiver, and, second, that the interest penalties were not a part of the assessed taxes, that they were imposed as a method of assisting in the collection

of the assessed taxes, that they had not reached the *status* of a vested right, and that the legislature had full authority, at any time before payment or consolidation with the tax debt into a judgment, to repeal or modify the legislation under which the penalties had run.

There is, I think, no ground for argument on the proposition that *if* there was lawful consideration, the waiver was not a gift. It is elemental that a transfer upon consideration is not a gift. The opposing argument must, necessarily, be that there was not consideration.

What is consideration? Consideration may be a detriment incurred by the grantee, or a benefit received by the grantor. It has been held that a trifling inconvenience to the one party or a slight advantage to the other is sufficient to constitute lawful consideration, *The Coast National Bank* v. *Bloom, 113 N. J. Law 597, 602;* but this was said of a transaction between parties with unrestricted powers to contract. The legislature was so limited by the constitutional intervention that it might not make a gift; therefore it could not, under the ruse of consideration, make a contract that was in essence a gift; it could not, as was said of a provision in the New York constitution prohibiting the granting of extra compensation to a contractor (*McGovern* v. *City of New York, 234 N. Y. 377; 138 N. E. Rep. 26*), call a consideration that which was no consideration at all, or wherein the shred of value, if any, was so disproportionate to the return that to uphold it as sufficient would be to nullify the constitution by subterfuge and fiction. Consequently, if that which is advanced by the legislature as consideration for the contracts with the railroads is clearly subterfuge and fiction, a ruse without substance, the statute which authorizes those contracts is invalid and should be so held; but not otherwise. It would be wrong for the legislature to make a gift under the guise of a contract embodying consideration, for that would be contrary to the state constitution; it would be equally wrong for the court to substitute its views for those found by the legislature within its accredited constitutional sphere of discretion and determination, for that, too, would be contrary to the state constitution. The difference is that

we review the action of the legislature and may set it aside whereas no one reviews our action, and the action, right or wrong, stands; which should cause us to be very circumspect in condemning the motives and the determinations of that coordinate branch of the government, the members of which are elected by, and presumably speak for, the people.

Among the legislative findings embodied in the disputed statutes and bearing upon the question of consideration are these: (preamble, *chapter 290, P. L. 1941*) "The unpaid railroad taxes have tended to create a chaotic condition in State and municipal finances, and the entire State has an urgent and important interest in the immediate solution of the question of delinquent railroad taxes and in the maintenance of stable transportation facilities and public finances," and (*chapter 241 P. L. 1942 § 15*) "the statutory interest penalty provisions of the applicable tax acts have not proven effectual to accomplish their purpose of assuring prompt payment of taxes * * *. It is imperative that a substitute and more effective and feasible method for the collection of such unpaid balances of taxes be provided promptly." From those and other premises of fact, the legislature found that by the compromise of the controversy upon the terms and conditions contained in the statute (*P. L. 1942 p. 663,* italics inserted) *"the state will have received full, fair and adequate consideration,* and the best interests of the state will have been served and furthered." Unless those legislative findings lack substance they should be final and conclusive on the advantage of the arrangement to the state and on the presence of consideration.

It is said that in substance the actual parties are the people of the state on the one side and the private railroad taxpayers on the other. I must dissent from this statement as a premise upon which the arguments are to move. True, as a technicality of pleading in this novel proceeding, the Attorney-General filed his information, in terms, on behalf of the people of the state; but that carries no presumption that the position taken by him is really to the interest of the people of the state. He acted on his own initiative, and whether, in a true sense, he was actually acting in the interest of the

people may be said to be one of the issues to be decided and not to be announced affirmatively as a premise. Further, to say that the real defendants are the private railroad taxpayers stultifies at the outset the assertions of the legislature that it passed the legislation in the interest of the state. I decline to proceed toward my conclusions on any such assumption. Also, it is said that the legislature intended to remit to the railroad companies $24,000,000 of the people's money; and I submit that the characterization of that fund as "of the people's money" is also a begging of the question because it assumes as a fact that which is one of the issues to be determined, namely, whether the interest accumulations had come to the *status* that the state had a vested right therein.

In addition, it is said that some of the conclusions of fact are not well grounded in the evidential proofs, but that, too, I think is an unwarranted criticism. The railroads are not parties to this action. The real defendant, in my view, is the legislature which at the urging, and with the co-operation, of the Governor undertook the official acts now under attack. This will presently more clearly appear. On such an issue we should, where reason will permit, resolve all doubts in favor of legislative authority even without any legislative expression other than the specific direction of the statute; and where, as here, the legislature has supplemented the effective statutory directions by findings and reasons complementary thereto, we should receive those expressions with dignity and respect not only, but, so far as is consistent with reason and undisputed facts, with credence. The call for evidential proof in a proceeding of this character—the character being that the proceeding is in effect a suit against one of the major branches of the state government on the question of whether it has overstepped its function—is an evasion of the only question that we, as a court, have a right to ask in that respect, namely: Did the legislature have a substantial foundation for the facts that it found and for the appraisal of events, past, existing and anticipated, at which it arrived? On a contention that arose about a statute prohibiting certain night work for women the United States Supreme Court said:

"Testimony was given upon the trial to the effect that the

night work in question was not harmful; but we do not find it convincing. Where the constitutional validity of a statute depends upon the existence of facts, courts must be cautious about reaching a conclusion respecting them contrary to that reached by the legislature; and if the question of what the facts establish be a fairly debatable one, it is not permissible for the judge to set up his opinion in respect of it against the opinion of the lawmaker. The state legislature here determined that night employment of the character specified was sufficiently detrimental to the health and welfare of women engaging in it to justify its suppression; and, since we are unable to say that the finding is clearly unfounded, we are precluded from reviewing the legislative determination." *Radice* v. *New York, 264 U. S. 292, 294; 68 L. Ed. 690, 694.* Again, in *Stephenson* v. *Binford, 287 U. S. 251, 272; 77 L. Ed. 288, 299,* the same court said: "If the legislature so concluded, as it evidently did, that conclusion must stand, since we are not able to say that in reaching it that body was manifestly wrong (citing cases). Debatable questions of this character are not for the courts, but for the legislature, which is entitled to form its own judgment." That is the law as I understand it; and if it is the law as against a litigating party in interest, by so much the more is it the law as against the Attorney-General when he wages the contest, not against an interested party, but against an officer representing the state government. It is impossible to catalogue all of the data upon which the legislature was privileged to draw as a guide to action. Legislatures do not make up formal records of the facts and circumstances which induce legislation. Even all of the matters that have been brought to us may not be reflected here. And I do not propose to touch upon all of the matters argued in appellant's brief as constituting legal consideration. I shall discuss one factor sufficient, I believe, to carry the point that the legislative findings had substantial foundation and that the considerations set up by the legislature were real and had actual value.

There was a practical demonstration before the legislature of the questionable and even faulty tax enforcement laws

sufficient to furnish substantial and reasonable ground for the finding (*chapter 241, P. L. 1942 § 15*—at *p. 661*), in view of the condition of state and municipal finances, that the existing statutory incidents were not efficient to accomplish collection of the arrears and that "it is imperative that a substitute and more effective and feasible method for the collections of such unpaid balances of taxes be provided promptly;" and if it is established that there was reasonable ground for doubting the effectiveness of collection methods under the old tax law, then there was, unquestionably, sound reason for the legislature to conclude, just as there would be sound reason for any creditor doubtful of his collection facilities to conclude, that a compromise making sure of the collection of the debt itself, waiving interest, was to be preferred above the delays of protracted litigation and uncertainty as to the result. The tax statute (*R. S. 54:28–1, et seq.*) set forth a mandatory procedure by which, if a railroad tax remained unpaid in whole or in part for *ten days* after the time limited for payment, the Attorney-General was *directed* to *proceed summarily to enter a judgment* for the tax upon producing a certified record of non-payment from the Comptroller, and to apply for an order that *execution issue forthwith* and the officer named in the execution was *directed to sell forthwith* "all the franchise, real estate and rolling stock and property of the company." That was a mandatory, summary and immediate proceeding enjoined upon the Attorney-General. On its face it was the essence of simplicity for the speedy collection of railroad taxes. The first of the unpaid taxes became delinquent in 1932. No proceedings were instituted until October 29th, 1939, when the Attorney-General served notice on all of the railroads whose 1932 and 1933 taxes had not been paid in full that he would apply to a Supreme Court Justice looking toward a sale of the various railroad properties on account of the tax delinquencies for those years. The period from the due dates of the several annual assessments until October, 1939, is said to have been shut by state and federal litigation and restraints incident thereto against proceedings for judgment and sale; the institution of those proceedings, when finally undertaken, resulted

in some collections. There obviously was freedom of action from October, 1939, forward; and however substantial the collections, there were substantial amounts unpaid, as appears elsewhere herein; but there appear to have been no judgments *and there were no sales*. Further, there appear to have been no proceedings to sell for unpaid 1934 taxes and taxes of later years. This carries no criticism of the Attorney-General and his office who seem to have done all that skilled and diligent legal service could do; but the very fact that the department, intent on expeditious administration of the law in accordance with the constitution, came so far short of the objective was fair ground for the legislative belief that there was something wrong with the law. One adverse circumstance lay in the perilous financial condition of the railroads; another in the fact that railroad taxes were laid against the proprietary companies and not against the lessee or operator of a system. There is not, so far as I have discovered, evidential proof that the inter-company leases provide for payment of taxes by the lessees, or that such provisions, if they exist, were made for the benefit of the state. In October, 1939, when the proceedings to sell for 1932 and 1933 delinquencies were begun, the New York and New Jersey Railroad and about fifteen railroads included in the systems operated by the Erie and the New York, Susquehanna and Western Railroads were in the hands of trustees appointed under federal bankruptcy statutes. The Attorney-General was without authority to proceed then against those companies. Following the service of the Attorney-General's notice but before its return date the Central Railroad Company of New Jersey applied to the federal court for relief under the Bankruptcy Act. Trustees were appointed and thereupon the proceedings were interrupted as to that railroad. Hearings in the tax sale proceedings against the remaining railroad companies have been adjourned from time to time. There were seven major railroad systems whose taxes were in default. The taxes were laid but there were nearly one hundred local proprietary railroad companies, most of whose properties were used and operated as a part of the major interstate railroad systems. Four of those proprietary companies were embraced in the Central Railroad Company of

New Jersey system; eleven in the Delaware, Lackawanna and Western system; fifteen or more, as stated above, in the Erie and the Susquehanna systems; four in the Lehigh Valley system; three in the New York Central system and four in the Reading system. There was the possibility, even the probability, that following actual sale under the Delinquency Act there would be a disintegration of the several railroad systems into their numerous component parts, a disturbing prospect for those who believed that our transportation facilities should be coordinated in the interest of safety, efficiency and speed; and there was uncertainty, in the event of tax sale, as to who should operate a railroad during the ensuing two year redemptive period. For whatever reason, those statutory proceedings were not prosecuted to finality. The incident was a part of the problem that was thrown on the legislature for solution; and it went, with other circumstances, to provide ground for the decision that other and more effective methods must be found for the collection of the unpaid tax balances. I suggest that in this chapter of events alone, with its disappointments, its delays and its apparent failures, there was enough to afford a rational basis for the determination to bargain for the collection of the principal of the tax at the cost of waiving the penalty.

The other circumstances included the great body of common knowledge of which the legislature was bound to take cognizance. The State of New Jersey is so situated industrially, geographically and in point of population that many railroads operate within its borders, some largely intrastate, some as part of widely extended, even transcontinental, systems. As of 1941 the railroads, as a class, had over a period of years been struggling against adverse conditions; they were subject to supervision by federal and state commissions; they were not in control of the rates to be charged or of the service to be rendered; they could not, at their will, discontinue unprofitable traffic. Deep inroads in their business were being made by the competition of the automobile, bus and airplane in passenger traffic and by auto trucks in the carrying of goods; facilities that had caught the public facny, had no right of way to maintain and were relatively free of

public taxes. The railroads meanwhile, as a class, were heavily burdened by taxation; some were in bankruptcy, others on the verge. The Attorney-General takes the position that "the fact of receivership in nowise impairs the ability of a railroad to serve the public;" possibly he is right; but certainly there is room for difference of opinion thereon, and the legislature was entitled to reach its own conclusion which apparently it did and with a different result. There was a substantial body of public thought to the effect that the railroads were experiencing a permanent decline as major factors in the transportation of passengers and freight. At the same time it was the view of many sober minded people that notwithstanding the existence of newer methods of transportation the railroads were essential to industry and to society generally and were urgently needed as factors in the war that already, at the time of the passage of the first of the statutes, had partly gripped this country and obviously would, as it did in fact, soon involve it as an actual participant. Those matters were all of common knowledge and served to emphasize the need, in the interest of the state, for a certain and speedy method of collecting tax arrearages.

Current court decisions were also within the field of authoritative legislative knowledge. These decisions ranged from blunt criticisms of New Jersey railroad taxation methods to holdings demonstrating the inability of the railroads to regulate the extent and character of service upon the basis of profit and loss. In the case of *Lehigh Valley Railroad Co.* v. *Martin, 100 Fed. Rep. (2d) 139* (at *p. 143*), the United States Circuit Court of Appeals said (1938): "The record now before us convinces us that the method of assessment employed by the State of New Jersey for railroad properties may be justly criticised and might well be subject to revision." The inability of a railroad to control the character and extent of its service on the basis of profitable or unprofitable return was well exemplified by our own recent decision in *O'Connor* v. *Board of Public Utility Commissioners, 129 N. J. Law 263,* wherein we held that even the Board of Public Utility Commissioners could not relieve a railroad company of its duty to maintain passenger transportation, however unprofit-

able by reason of competitive bus service, so long as it continued to transport freight and thus to retain its franchise.

A further source of information to the legislature was under direct authority of the constitution: The Governor "* * * shall communicate by message to the legislature at the opening of each session, and at such other times as he may deem necessary, the condition of the state, and recommend such measures as he may deem expedient." *Constitution, article V, section 6.* Messages from the Chief Executive to successive legislatures on the subject-matter were urgent and repeated. Governor Moore in a message to the legislature in November, 1933, relating to the method of taxing railroad property and to the then existing litigations out of which the present development ultimately came said (italics inserted): "I, therefore, respectfully urge that a committee representative of the legislature and of the state be appointed that will with diligence and dispatch undertake in a painstaking and systematic manner the study of this question for the purpose of reaching some intelligent conclusion as to the course of action necessary to be taken by the legislature for the modification or clarification of this law. *While it may be impossible to sustain railroad assessments to the amount which they have been assessed in recent years, it is entirely probable that some basis of rate and method of assessment may be arrived at which we can sustain in the courts,* and thus end the interminable controversies which we now appear to be engaged in." A year later Governor Moore sent a further message to the legislature recommending the attention of that body to the legislation proposed by the special committee as affording "a just basis for settlement of the problem in a manner that will enable the state to immediately collect several million dollars of overdue tax revenue." Those were deliberate, formal messages from the chief executive to the legislature on the condition of the state. I am sure that no one will interpret them, and that the legislature did not interpret them, as communicated in the interest of the railroads. From them several facts stand out as wholly inconsistent with the suggestion that the objective was without value to the state, or, if it had value, a mere shred. The

Governor was obviously of the conviction that the subject-matter was of the utmost importance to the state; he looked to the legislature to formulate a "just basis" for settlement; he wanted the legislature to do something about it so that the "interminable" controversies be ended and so that the state would be enabled to collect the several millions of overdue tax revenues. But if the Attorney-General is right, it would seem that the legislature could do *nothing* about the overdue tax revenues because to do something other than to collect would be to make a gift; and obviously it was not the function of the legislature to do the collecting.

On January 14th, 1936, Governor Hoffman in his inaugural address reminded the legislature that the solution of the problem was a legislative duty. He referred to Governor Moore's earlier messages and said, "This is an admittedly complicated problem. It must be attacked with some courage and in a forthright way. The moneys due are badly needed by our municipalities in liquidation of the obligations contracted against these taxes. I would urge that the legislature seek an early solution."

Still within the field of constitutional gubernatorial message, but partaking also of the nature of a public and a scientific reaction to the need for early and radical legislation, was a movement initiated by Governor Edison. On December 1st, 1940, a few weeks after the election of Governor Edison, the unpaid balances were as stated above. Governor Edison appointed a committee of eminent and qualified citizens, among them the director of Princeton Surveys of Princeton University, to investigate the facts, study the questions involved and advise a solution. That committee on February 22d, 1941, made a comprehensive and widely circulated report which went into detailed facts and figures and the significance thereof. It is an economic rather than a legalistic study; but as a complete and scholarly review of the economic aspect of this important question, compiled by men of broad experience and diverse occupations, with the benefit of facts gathered by trained investigators, it has high value. It is of too great volume to be presented here even in condensed form. It made certain recommendations, the first of which was that there

be legislative action to permit "the payment of all railroad tax delinquencies in full, *over a designated period of years without penalty.*" (This was enacted into law and is the crux of the present litigation.)

In the light of that report the legislature appointed a joint legislative committee which reported back to the two houses a series of four recommended bills stated to be "the same bills, with minor changes, prepared for the Governor's special committee by the Princeton group and submitted" to the legislative committee "by Governor Edison, with his approval and recommendation;" and the legislative committee added further that "The Princeton Surveys have vouched for the complete integrity of the research work upon which this program is based and issued a public statement to the effect that this legislation is sound and workable, and in the best interests of the people of the state." One of the bills attached to the committee report was enacted substantially as submitted and became chapter 290 of the laws of 1941, which, with an amending statute, chapter 241 of the laws of 1942, is the legislation now in dispute.

I have reviewed some of the aspects of the case which seem to me to sustain this result: The delinquencies had, over a period of eight or nine years, run into a vast figure by reason of which the state and municipal finances were greatly depleted. Some of the railroads had gone into insolvency, the end of which was unforeseeable. Others might do so. The position of a creditor, even of a preferred creditor, of an insolvent debtor, is frequently perilous. There were indications that the railroads, or many of them, were losing in competition with other carriers. Not only was the position of the state as a creditor imperiled, but the state, as a body politic by reason of its peculiar geographical and industrial character, could ill afford to have the railroads deteriorate; and this latter situation did not better the prospect for the collection of steadily increasing debts. The legislature had come to the conclusion that the tax collection law was ineffective and unfeasible. Governors had repeatedly importuned the the legislature to effect a means of collecting the arrears, which, of course, was to be accomplished only by legislation

if the legislature was to do it; also a specially appointed public committee made intensive study and specific recommendations. The recommendations ceased to be general and were resolved into precisely that which was done. If all do not concur with the conclusions just expressed, and of course all do not, nevertheless I consider that there was substantial ground for the legislature to so think and, so thinking, to enter into a contract with the railroads whereby the state waived the penalties in consideration of having the principal debt put in better position. On a compromise of a disputed claim made *bona fide* as a good consideration for a contract, see *Grandin* v. *Grandin, 49 N. J. Law 508*. A sidelight on the practical working of the legislative scheme to produce results is that on December 21st, 1943, according to information from the office of the State Comptroller, there were in hand checks and drafts totalling $19,570,626.12 which, were it not for the pendency of these proceedings, would have been available for the urgent need of the state and the various agencies and subdivisions thereof.

There seems to have been a rational and plausible basis for the conclusions and findings determined by the legislature and upon which the legislature grounded the statutes now in dispute; and this includes the finding that there was fair consideration passing to the state. The statute was contractual and required a written acceptance within a limited time by any railroad taxpayer which desired to avail itself of the provisions. Aside from the benefits found to accrue to the state, there were burdens assumed by the contracting companies, such as the discontinuance of all pending appeals, the actual payment of assessed taxes in full, payment of interest at three per centum per annum from December 1st, 1940, on deferred payments, the waiver of right to contest the legality or amount of assessments up to and including 1941 (the legislature determined, *chapter 241, section 15, P. L. 1942,* that "debatable questions of law and fact relating thereto are still pending and undetermined"), and particularly, in the case of a railroad operated as a part of a railroad system, an agreement by the operating company to pay. I do not find in the record that upon which we may condemn

the legislature as having set up as consideration that which was no consideration at all, or if any, only a shred; nor do I discern as the purpose, or as a likely result, the nullification of the constitution by subterfuge and fiction. The fact, if it is a fact, that the turn of subsequent events, not reasonably foreseeable, has averted some of the anticipated dangers is not in point. Conclusions must be made in the light of conditions as they are or seem to be, not as they are developed by the unfolding future. The courts have necessarily and always the jurisdiction to pass upon constitutionality, but in the determination *per se* of public policy the legislature has an authority which excludes the intervention of the courts. *Schenley Products Co.* v. *Franklin Stores Co., 124 N. J. Eq. 100, 106; State* v. *Donovan, 129 N. J. Law 478, 486.* Public policy leads directly to public welfare, and here, too, subject of course to the inhibitions of the constitution, the legislature is supreme. Further, our courts in passing upon sections 19 and 20 of article I of the constitution have required that there should be a valuable consideration, but have refused to make nice admeasurement of the adequacy of it. *Morris and Essex Railroad Co.* v. *Newark, 76 N. J. Law 555; Runnemede* v. *New Jersey Water Co., 123 N. J. Law 383, 387.* An act of the legislature will not be declared void by the courts if its unconstitutionality is in any wise doubtful, *Attorney-General* v. *McGuinness, 78 N. J. Law 346; State Board of Milk Control* v. *Newark Milk Co., 118 N. J. Eq. 504;* nor may the courts enter the legislative domain and function as censor of the reasonableness or wisdom of legislative enactments, *Douglass* v. *Board of Chosen Freeholders, 38 N. J. Law 214; In re Freeholders of Hudson County, 105 N. J. Law 57.*

It is clear to my mind that there was substantial foundation for the findings of fact, for the valuations placed upon those findings and for the conclusion reached; and if there was substantial foundation, judicial inquiry in that direction should end there.

I come to the second ground, namely, that apart from contract or consideration the legislature had clear authority to waive the twelve per centum annual addendum. The unpaid taxes and the interest additions involved in these proceedings

were levied under statutory provisions formerly in *chapter 208, P. L. 1888,* and various acts amendatory thereof and supplemental thereto and printed in the current revision as *R. S. 54:19–1, et seq. R. S. 54:27–4* provides that if the taxes of any company shall remain unpaid on December 1st following the levying thereof the taxes "shall thenceforth bear interest at the rate of one per cent. for each month until paid \* \* \*. These taxes shall be a lien paramount to all other liens \* \* \*. The lien shall take effect on June first of the year in which the tax is payable and shall be a debt due from the company to the State \* \* \*." Upon that provision, and very largely upon the words "shall be a debt," is predicated the argument that the addition of one per centum per month becomes, month by month, a vested interest. But the addendum is referred to elsewhere in the statute as a penalty. In *R. S. 54:29–5* we find these expressions: "payment of taxes and penalties due to the State;" "the amount of taxes imposed, together with penalties;" "the taxes and penalties." The context, therefore, supports the construction, which I consider is not only supported by the statutes but is required by our decided cases, that the "interest" imposed by the statute is not meant to be a part of the tax but is a penalty imposed for delinquency in the payment of the tax. I infer that the legislature, when drafting the disputed statute, used the expression "interest penalties" as a convenient way of gathering up two words which the then existing statute in the last cited sections seems to have used, just as our decisions appear to have used them, as referring to the item, now in litigation, sometimes called interest and sometimes called penalty.

The decisions in the state are strongly to the effect that the charge called interest is in fact a penalty and, as such, falls with the repeal of the statute which created it. *Town of Belvidere* v. *Warren Railroad Co., 34 N. J. Law 193; Dixon* v. *Jersey City, 37 N. J. Law 39.* In the *Belvidere Case* (opinion by Beasley, C. J.), the effect of *chapter 194, P. L. 1862,* was under review. The effort was to collect from the defendant railroad company a tax that was assessed under the statute and also a twelve per centum per annum addition

thereto. The language of the statute was "that if any person or corporation shall neglect or refuse to pay the tax due from such person or corporation, by the time appointed by law for payment of the same, such delinquent shall pay interest on said tax at the rate of twelve per cent. per annum upon the amount of such tax from the time of such delinquency until such tax be paid." The statute had been repealed after the assessment but before the payment of the tax. It was held that the tax itself was collectible under the General Tax Law but that the twelve per centum, designated interest, was really a penalty, and not a part of the tax, and could not be recovered after the repeal of the act which awarded it. The Supreme Court decision was affirmed by this court in *35 N. J. Law 584,* where it was said: "The twelve per cent. was a creature entirely of section fifteen of the act of 1862, and is in its nature a penalty for delinquency in the payment of taxes. The repeal of the statute defeated the claim under it * * *." The *Dixon Case,* opinion by Van Syckel, J., is to the same effect. So, generally, as to statutes setting up penalties or forfeitures; *State of Maryland v. Baltimore and Ohio Railroad Co., 3 How. 534; Yeaton v. United States, 5 Cranch 281; Commonwealth v. Standard Oil Co., 101 Pa. 119.* In *Burlington County v. Martin, 128 N. J. Law 203* (Brogan, C. J.), *affirmed, 129 N. J. Law 92* (the litigation concerned a transfer inheritance tax), it was said: "In our view, taxes and interest are distinct things. A tax, not being a debt in the legal sense, does not automatically bear interest, if delinquent, unless the legislature so provides. Interest does not inhere in a tax as a legal incident. *Camden v. Allen, 26 N. J. Law 398.* Interest is an exaction for past due obligations, and in essence is a penalty or in the nature of a penalty. Interest or penalty, however one characterizes it, is not taxation but rather a punitive sanction for compelling timely payment of the tax. It is compensation for delay in payment. *Dixon, &c., v. Jersey City, 37 N. J. L. 39.* In this case it is for non-payment within the time fixed by statute (compare *Bugbee v. Tatum, 103 Id. 600*). We are of the opinion that the interest on this tax was not, nor did it become, part of the tax."

*Pennsylvania T. and T. Co.* v. *Gummere, 87 N. J. Law 353* (Supreme Court, Garrison, J.), is particularly pertinent because it involves a construction of sections 9 and 10 of the Railroad and Canal Property Tax Act, *chapter 208, P. L. 1888,* as amended, under which statute (and the equivalent provisions in the Revision, *R. S. 54:19–1, et seq.*) the taxes, now delinquent, were assessed. It was held that while the 1888 statute did provide that the tax should "bear interest at the rate of one per centum for each month until paid," the impost was not a part of the tax as interest would be, but was really a penalty—a method of enforcing its payment and hence "in the nature of a remedy for its non-payment," citing *Dixon* v. *Jersey City, supra,* in support of that proposition.

In all respects pertinent to the present discussion *R. S. 54:27–4* is practically a duplication of the equivalent provisions in sections 9 and 10 of the 1888 statute. The comparison follows:

| *P. L. 1888, ch. 208* | *R. S. 54:27–4* |
|---|---|
| Section 10 | |
| If the taxes of any company, or any portion thereof, remain unpaid on the first day of February following the levy thereof, such company shall be considered in default, and such taxes, or such unpaid portion thereof, shall thenceforth bear interest at the rate of one per centum for each month until paid, notwithstanding the prosecution of any writ of *certiorari* or other remedy * * *. | If the taxes of any company, or any portion thereof, remain unpaid on December first following the levy thereof, the company shall be considered in default, and such taxes, or the unpaid portion thereof, shall thenceforth bear interest at the rate of one per cent for each month until paid, notwithstanding the prosecution of a writ of *certiorari* or other remedy. |

Section 9

| * * * the tax * * * | These taxes |
|---|---|
| shall be a lien paramount to all other liens upon all the lands and tangible property and franchise of such company in this state; | shall be a lien paramount to all other liens upon all the lands and tangible property and franchises of such company in this state. |
| such | The |
| lien shall take effect on the first day of November; * * * | lien shall take effect on June 1st. * * * |
| Said tax shall be a debt due from such company to the state on that date, for which an action at law or | And shall be a debt due from the company to the state on that date for which an action at law or suit |
| in equity may be maintained and which shall be a preferred debt in case of insolvency. | in equity may be maintained and shall be a preferred debt in case of insolvency. |

Those who would have the per centum addition made an integral part of the tax, as a debt due to the state, lean heavily upon the provision that "The lien * * * shall be a debt due from the company to the state;" but they overlook the fact that the identical provision was in the statute when *Pennsylvania T. and T. Co.* v. *Gummere, supra,* which has stood as the unchallenged law of the state for nearly thirty years past, decided that the so-called "interest" was not a part of the tax but was a method of enforcing the payment and was "in the nature of a remedy for its non-payment;" and they forget, also, that the construction is weighted by the intervening years and that there has been a re-enactment of the statute—the 1937 Revision—in the same language. *State* v. *Moresh, 122 N. J. Law 77, 79; Commercial Trust Co.* v. *Hudson County Tax Board, 87 N. J. Law 179, 183.* It is beside the point to say the *Belvidere* and *Dixon Cases* antedated the enactment of the constitutional provision or that the *Pennsylvania T. and T. Co. decision* does not mention the constitution. The two cases first mentioned go to the nature of that item frequently referred to in tax statutes as interest and the third case goes to the significance of that appellation in the very statute under which the disputed taxes

were levied. It is not a distinction to characterize those cases as involving the construction of a penal statute. They involve just what we are talking about; and if, for instance, in the *Pennsylvania T. and T. Case* the addendum was a penalty, then so are the like items in the instant case penalties. It is, of course, my view that they are exactly that.

Practical construction through the years is accepted as a guide to the meaning of written law. *Burlington County* v. *Martin, 129 N. J. Law 92.* At the legislative session following the adoption of section 20 of article I of the constitution (voted September 7th, 1875, proclaimed September 28th, 1875) the legislature passed *chapter 81, P. L. 1876* (approved April 11th, 1876). The statute recited, in its preamble, that "in consequence of depression in business taxes * * * have not been paid, and by reason of such default, large rates of interest and excessive penalties have been imposed thereon, and thereby the collection of said taxes in a great degree prevented" and in the body of the act empowered the governing body of any city to authorize the receipt until December 1st, 1876, of all taxes, unpaid as of May, 1875, with an interest charge not less than seven per centum nor more than twelve per centum per annum, as the governing body might determine, in full satisfaction. The statutory interest rate had been fixed by *chapter 487, section 27, page 1089, P. L. 1866* (see *Rev. 1877 p. 1159 plac. 85*) at twelve per centum per annum. Corporate taxpayers were not distinguished from individuals. If the present statutes violate the constitutional prohibition of 1875 against gifts so did that 1876 statute. In the 1876 legislature were men of such stature in the law as William J. Magie, later State Supreme Court Justice and still later Chancellor, John W. Griggs, later Governor of the State and still later Attorney-General of the United States, James J. Bergen, later Vice-Chancellor and still later justice of the Supreme Court, and Leon Abbett, later Governor and still later justice of the Supreme Court. The statute was approved by Governor Bedle who, six months earlier, had issued the proclamation declaring the adoption of the constitutional amendment, and who had been a justice of the Supreme Court until he became Governor. It is hardly to be

thought that those men, or indeed their legislative associates, would fail to have a keen appreciation of the purport of a constitutional amendment then so recently added to our fundamental law. As a contemporaneous practical construction of what the amendment *did not mean* the passage of that statute had peculiar significance. Numerous other statutes of related effect have since been passed (see *e. g.,* the Martin Act, *chapter 112, P. L. 1886,* passed upon in *In re Commissioners of Elizabeth, 49 N. J. Law 488,* and in *Flock* v. *Smith, 65 N. J. Law 224*), and I believe that none of them has ever been declared to be a violation of that constitutional provision. In *Essex Public Road Board* v. *Skinkel, 49 N. J. Law 641,* this court reviewed *chapter 186, P. L. 1882,* the title of which was "An act to authorize the compromising or settling by arbitration of any tax or assessment laid by any public road board in this State." The opinion said (at *p. 672*) : "No constitutional right is violated, and the public is benefited. When the legislature found that a mistaken and oppressive policy had been pursued, it was not only its right, but its duty, to furnish a mode of relief." See, also, the decision below in the same case, *47 N. J. Law 93.* The statute was retrospective in character and authorized a compromise of an assessment legally imposed and delinquent before the passage of the act. There is the element of good law supplemented by sound business sense, as applied to tax penalties not yet reduced to judgment or otherwise metamorphosed into a vested interest, in a recent expression by the Supreme Court of Ohio in *State* v. *Guckenberger, 17 N. E. Rep. (2d) 743:* "It seems certain and indisputable that none of the provisions of the federal and state constitutions was intended so to manacle and shackle legislatures that they could not remit accrued charges against delinquent taxpayers for the purpose of aiding in the collection of taxes when it became evident that such charges no longer accomplished the purpose for which they were imposed but hindered and delayed the collection."

*In re Voorhees, 123 N. J. Eq. 142,* cited *contra* the constitutionality of the tax statutes, is not, in my judgment, even relevant to the present issue. That litigation had to

do with a transfer inheritance tax of $75,000 which was assessed on a gift under the will of Elizabeth Rodman Voorhees, deceased, to the New Jersey College for Women. Miss Voorhees died September 21st, 1924. The right to the tax vested immediately at her death. The tax was due and payable at that moment. Later a statute was passed exempting any bequests made since the 1st of July, 1924, to or for the use of any institution solely educational for whose benefit there might have been or might thereafter be appropriations made by the legislature of the state. It was held that the right to the tax had vested, and that the attempted annulling of it by the legislature was invalid; but at the same time the decision conceded the validity of annulling even a vested obligation if that remission was supported by some legal, equitable or moral consideration. There are other distinctions between that case and this, but a conclusive difference is that it concerned the tax and not a penalty, while this concerns a penalty and not the tax.

By the weight of judicial decisions in this state the per centum addition, whatever name be given to it, is not a part of the tax. It is a form of remedy provided for the collection of the tax. The statute which authorized the addition may be lawfully repealed, and with the repeal the obligation to pay ceases. Control thereover is within the province of the legislature.

Legislation respecting the separate taxation of railroads is not special. *State Board of Assessors v. Central Railroad Co., 48 N. J. Law 146, 271.* The limitation of the statutes to railroad taxpayers which are delinquent does not make the statutes special. It is not a complete, although it is a pertinent, answer to the argument *contra* to say that where statutes of grace have been passed for the benefit of general taxpayers in distress such relief has been uniformly limited to delinquents; but it is a complete answer to say that the legislation under review does "embrace all and exclude none whose conditions and wants render such legislation equally appropriate to them as a class." *Wanser v. Hoos, 60 N. J. Law 482; In re Application of Prudential Insurance Company of America, 132 N. J. Eq. 170; Randolph v. Wood,*

*49 N. J. Law 85; Slate* v. *Borough of Claylon, 53 N. J. Law 277; Quigley* v. *Lehigh Valley Railroad Co., 80 N. J. Law 486.* The questionable course would have been to afford a refund to the railroads which had paid their taxes.

The disputed statutes, in my opinion, were enacted by the legislature with full constitutional authority.

I am authorized by Justices Parker and Colie, and by Judge Wells, to say that they concur in this opinion.

*For affirmance*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, PERSKIE, PORTER, DEAR, RAFFERTY. THOMPSON, DILL, JJ. 10.

*For reversal*—PARKER, CASE, COLIE, WELLS, JJ. 4.