RICHARD BLUMENTHAL, ATTORNEY
GENERAL *v.* ROBIN BARNES
(SC 16597)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued March 19—officially released August 20, 2002

*Eliot D. Prescott*, with whom were *Gregory T. D'Auria* and *David E. Ormstedt*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellant (plaintiff).

*William M. Bloss*, for the appellee (defendant).

*Opinion*

ZARELLA, J. The sole issue in this appeal is whether the plaintiff, Richard Blumenthal, the attorney general of the state of Connecticut (attorney general), has common-law authority to maintain an action against the defendant, Robin Barnes, the president and treasurer of Village Academy, Inc. (academy), for several alleged breaches of her fiduciary duties to the academy. The attorney general filed a three count complaint against the defendant in which he alleged, inter alia, that the defendant had enriched herself at the expense of the academy, an educational, not-for-profit organization, by entering into one lease and two employment agreements with the academy. The defendant moved to dismiss the complaint on the ground that the attorney general lacked authority to maintain the "action in his

own name." The trial court denied the defendant's motion, concluding that the attorney general had standing under General Statutes § 3-125[1] to pursue an action

[1] General Statutes § 3-125 provides in relevant part: "The Attorney General shall have general supervision over all legal matters in which the state is an interested party, except those legal matters over which prosecuting officers have direction. He shall appear for the state, the Governor, the Lieutenant Governor, the Secretary, the Treasurer and the Comptroller, and for all heads of departments and state boards, commissioners, agents, inspectors, committees, auditors, chemists, directors, harbor masters, and institutions and for the State Librarian in all suits and other civil proceedings, except upon criminal recognizances and bail bonds, in which the state is a party or is interested, or in which the official acts and doings of said officers are called in question, and for all members of the state House of Representatives and the state Senate in all suits and other civil proceedings brought against them involving their official acts and doings in the discharge of their duties as legislators, in any court or other tribunal, as the duties of his office require; and all such suits shall be conducted by him or under his direction. When any measure affecting the State Treasury is pending before any committee of the General Assembly, such committee shall give him reasonable notice of the pendency of such measure, and he shall appear and take such action as he deems to be for the best interests of the state, and he shall represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes. All legal services required by such officers and boards in matters relating to their official duties shall be performed by the Attorney General or under his direction. All writs, summonses or other processes served upon such officers and legislators shall, forthwith, be transmitted by them to the Attorney General. All suits or other proceedings by such officers shall be brought by the Attorney General or under his direction. He shall, when required by either house of the General Assembly or when requested by the president pro tempore of the Senate, the speaker of the House of Representatives, or the majority leader or the minority leader of the Senate or House of Representatives, give his opinion upon questions of law submitted to him by either of said houses or any of said leaders. He shall advise or give his opinion to the head of any executive department or any state board or commission upon any question of law submitted to him. He may procure such assistance as he may require. Whenever a trustee, under the provisions of any charitable trust described in section 45a-514, is required by statute to give a bond for the performance of his duties as trustee, the Attorney General may cause a petition to be lodged with the probate court of the district in which such trust property is situated, or where any of the trustees reside, for the fixing, accepting and approving of a bond to the state, conditioned for the proper discharge of the duties of such trust, which bond shall be filed in the office of such probate court. The Attorney General shall prepare a topical and

against the defendant insofar as he sought to remedy the misappropriation of charitable contributions made to the academy. The trial court further concluded, however, that the attorney general had no authority, statutory or otherwise, to pursue an action against the defendant to remedy the misappropriation of noncharitable academy receipts. In light of the nominal amount involved, the attorney general thereafter abandoned his claim with respect to the recovery of charitable contributions, which, according to the trial court, was authorized under § 3-125. Upon motion of the attorney general, the trial court rendered judgment in favor of the defendant, from which the attorney general appealed to the Appellate Court. Pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2, we granted the attorney general's motion to transfer the appeal to this court. We now affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The academy was a Connecticut nonstock corporation with federal tax exempt status under § 501 (c) (3) of the Internal Revenue Code. See 26 U.S.C. § 501 (c) (3) (1994). In 1997, the state department of education (department) granted the academy a charter to operate a state charter school,[2] which the

chronological cross-index of all legal opinions issued by the office of the Attorney General and shall, from time to time, update the same."

Public Acts 2000, No. 00-99, § 19, made technical changes to § 3-125 that are not relevant to the merits of this appeal. We hereinafter refer to the current revision of § 3-125.

[2] General Statutes (Rev. to 1997) § 10-66aa (1) defines a "charter school" as "a public, nonsectarian school which is (A) established under a charter granted pursuant to section 10-66bb, (B) organized as a nonprofit entity under state law, (C) a public agency for purposes of [the Freedom of Information Act], and (D) operated independently of any local or regional board of education in accordance with the terms of its charter and the provisions of sections 10-66aa to 10-66ff, inclusive . . . ." "State charter school" is defined specifically as "a new public school approved by the State Board of Education pursuant to subsection (f) of section 10-66bb." General Statutes (Rev. to 1997) § 10-66aa (3).

academy operated at 95 Fitch Street in New Haven. The academy opened its doors at that location in August, 1997, and remained there until the department revoked its charter in September, 1999. Although the academy received a small amount of charitable contributions,[3] it derived most of its operating revenue in the form of state funded tuition payments pursuant to General Statutes (Rev. to 1997) § 10-66ee, as amended by Public Acts 1997, No. 97-290, § 9, and Public Acts 1998, No. 98-168, § 24.[4] Accordingly, for the 1997–98 academic year, the academy received approximately $490,000 in tuition payments from the state on behalf of students enrolled in the academy. It received a similar amount in tuition payments during the 1998–99 academic year. In 1997, the academy also obtained a loan from the Connecticut health and educational facilities authority in the amount of $140,000. All of these funds, regardless of their source, were intended to enable the academy to carry out its educational objectives.

The defendant was the president and treasurer of the academy. She also served as a member of the academy's board of directors. In May, 1997, the defendant purchased property located at 95 Fitch Street in New Haven

---

[3] The academy received approximately $8000 in charitable contributions between 1997 and 1999.

[4] General Statutes (Rev. to 1997) § 10-66ee, as amended by Public Acts 1997, No. 97-290, § 9, provides in relevant part: "(c) (1) The state shall, annually, pay in accordance with this subsection, to the fiscal authority for a state charter school, for each student enrolled in such school, an amount equal to one hundred five per cent of the foundation level pursuant to subdivision (9) of section 10-262f, per student for the fiscal year in which the payment is made. Such payments shall be made as follows: Twenty-five per cent of the amount determined pursuant to this subsection in July and September based on estimated student enrolment on May first, and twenty-five per cent of such amount in January and the remaining amount in April each based on student enrolment on October first. . . ."

Public Acts 1998, No. 98-168, § 24, amended General Statutes (Rev. to 1997) § 10-66e (c), as amended by Public Acts 1997, No. 97-290, § 9, by replacing the formula for determining the dollar amount per student with a fixed amount.

and an adjacent parcel of land for $110,000.[5] Thereafter, the defendant entered into a renewable five year lease agreement with the academy under which the academy agreed to lease the premises at 95 Fitch Street and the adjacent parcel (leased premises) at an annual base rent of $54,999.96.[6] The defendant also entered into two separate employment agreements with the academy in August, 1998. Pursuant to the terms of the first agreement, the defendant agreed to devote an average of forty hours per month as the academy's administrative director from September, 1998, to May, 1999, in exchange for a salary of $38,000. The agreement further provided that the defendant would be paid a salary of $39,900 for the same services to be rendered between September, 1999, and May, 2000, and a salary of $41,895 for services to be rendered between September, 2000, and May, 2001. Under the second employment agreement, the defendant was hired as a consultant to act as a school superintendent from August 1 through August 31, 1998, at a salary of $30,000, from June 1, 1999, through August 31, 1999, at a salary of $33,000, and from June 1, 2000, through August 31, 2000, at a salary of $36,300. Additionally, the defendant had been paid $55,666 for services rendered to the academy between May, 1997, and May, 1998.

The attorney general alleged in his complaint that the defendant had breached her fiduciary duties to the academy by entering into the foregoing lease and employment agreements, which he further claimed were self-enriching and unfair to the academy. He also alleged that the defendant had breached her fiduciary duties to the academy when she had failed to meet the

---

[5] In return for title to the property, the defendant executed a promissory note in the amount of $110,000 in favor of the sellers of the property. The promissory note was scheduled to mature on May 1, 2000.

[6] The agreement fixed the annual rent during the five year renewal term at $54,999.96 plus 4 percent or $57,199.96.

payment schedule on the promissory note that was secured by a mortgage on the leased premises and when she had failed to prevent the mortgagees from instituting foreclosure proceedings. See footnote 5 of this opinion. The attorney general cited § 3-125 and the common law as authority for maintaining an action against the defendant.

In a memorandum of decision on the defendant's motion to dismiss, the trial court concluded that the attorney general did not have standing under common law to pursue his claims against the defendant and that his statutory authority to maintain an action against the defendant was limited, pursuant to § 3-125, to the protection of gifts intended for public or charitable purposes. Thereafter, the trial court denied the attorney general's motion to reargue the motion to dismiss and, upon motion of the attorney general,[7] rendered judgment in favor of the defendant. This appeal followed.

I

The attorney general claims that the trial court improperly concluded that he does not possess common-law authority to maintain an action against the defendant. He asserts that the trial court's conclusion renders the state without an effective remedy for addressing the defendant's self-dealing of academy assets. He further maintains that he has common-law authority to bring an action seeking to remedy breaches of fiduciary duties by those individuals entrusted with charitable funds, and that, pursuant to such authority, he may reach all of the misappropriated assets of the not-for-profit organization regardless of their source.

[7] We note that, in requesting the trial court to render judgment in favor of the defendant in order to permit him to appeal, the attorney general abandoned the only part of his claim on which he was statutorily authorized to proceed, namely, that part of his claim dealing with the protection of gifts intended for public or charitable purposes.

The attorney general identifies the former common-law authority of the state's attorneys to protect the integrity of charitable gifts as the source of his common-law authority. Specifically, the attorney general claims that the common-law authority over civil matters, including those matters involving the protection of public and charitable gifts, which formerly was vested in the state's attorneys, devolved to the office of the attorney general upon its establishment in 1897. He further contends that this court and the legislature have recognized and affirmed his common-law authority through decisional law and statutory enactments. We address the attorney general's arguments seriatim.

Before turning to the merits of the attorney general's arguments, we are compelled to underscore what is at issue in this appeal. This appeal does not address whether the attorney general has statutory authority to protect the integrity of charitable gifts or whether he has statutory authority to bring an action against a fiduciary of a not-for-profit organization to recover misappropriated charitable funds. Indeed, after the trial court concluded that the attorney general did have such authority, the attorney general abandoned his claim insofar as it was based on his statutory authority. See footnote 7 of this opinion. Rather, the issue before us is whether the attorney general has standing under common law to bring an action for breach of fiduciary duties by officers of a not-for-profit organization in order to remedy the misappropriation of the organization's noncharitable receipts.

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action . . . . Standing is established by showing that the party claiming it is authorized by statute to bring

suit or is classically aggrieved.[8] . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision." (Citation omitted; internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 308–309, 796 A.2d 516 (2002).

As a preliminary matter, we set forth the standard under which we review the trial court's granting of a motion to dismiss for lack of standing.[9] "A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the trial court's ultimate legal conclusion and resulting grant of the motion to dismiss [is] de novo." (Internal quotation marks omitted.) *State* v. *Welwood*, 258 Conn.

---

[8] We note that, for purposes of the present case, if the attorney general has standing under common law to bring an action against the defendant, such standing necessarily would be based on classical aggrievement.

[9] Although the trial court denied the defendant's motion to dismiss in concluding that the attorney general had authority under § 3-125 to bring an action against the defendant insofar as the attorney general sought to remedy the misappropriation of charitable gifts made to the academy, it also concluded that the attorney general did not have authority, statutory or otherwise, to bring an action against the defendant to remedy the misappropriation of noncharitable academy receipts. Thus, in effect, the trial court granted in part the defendant's motion to dismiss to the extent that the attorney general was precluded from proceeding with respect to the misappropriation of noncharitable academy receipts.

425, 433, 780 A.2d 924 (2001). We now turn to the attorney general's arguments.

A

The attorney general initially argues that the common-law authority of the state's attorneys over civil matters devolved to the office of the attorney general upon its establishment in 1897, and, therefore, that "[t]he [a]ttorney [g]eneral is simply a new branch on the tree rooted in the common law." We disagree.

In 1897, the office of the attorney general was established pursuant to Public Acts 1897, c. 191, § 1 (P.A. 191),[10] which is now codified as amended at General Statutes § 3-124.[11] Public Act 191, § 1, provides in relevant part: "There shall be an attorney-general chosen by ballot in the same manner as other state officers . . . ." Section 2 of P.A. 191,[12] which is now codified

___

[10] Section 1 of Public Acts 1897, c. 191, provides: "There shall be an attorney-general chosen by ballot in the same manner as other state officers on the Tuesday after the first Monday of November, 1898, and quadrennially thereafter, to hold his office for a term of four years from and after the Wednesday following the first Monday of the next succeeding January, and until his successor is duly chosen and qualified. If a vacancy shall occur in this office the governor shall appoint an attorney-general to fill such vacancy for the balance of the unexpired term."

The attorney general became a constitutional officer in 1970 pursuant to article fourth, § 1, of the constitution of Connecticut, as amended by article first of the amendments. See *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 572, 663 A.2d 317 (1995) ("the similarities between the chief state's attorney and the attorney general are obvious: both are constitutional officers of the executive branch and both, therefore, maintain the dual position of constitutional officer and member of the bar").

[11] General Statutes § 3-124 provides in relevant part: "There shall be an Attorney General to be elected in the same manner as other state officers in accordance with the provisions of section 9-181. He shall be an elector of this state and an attorney at law of at least ten years' active practice at the bar of this state . . . . The Attorney General shall devote full time to the duties of the office. The Attorney General shall give bond in the sum of ten thousand dollars."

[12] Section 2 of Public Acts 1897, c. 191, provides: "The attorney-general shall have general supervision over all legal matters in which the state is an interested party, except those legal matters over which the state's attor-

as amended at § 3-125, details the various duties and powers of the then newly established office of the attorney general, including the attorney general's authority to "represent the public interest in the protection of any gifts, legacies, or devises, intended for public or charitable purposes." Prior to the establishment of the office of the attorney general, however, the state's attorneys for the various counties had common-law authority to enforce charitable trusts, gifts and devises. See, e.g., *Dailey* v. *New Haven*, 60 Conn. 314, 325, 22 A. 945 (1891). This common-law authority encompassed other civil matters as well.

In *State* v. *Keena*, 64 Conn. 212, 29 A. 470 (1894), this court discussed the powers of the state's attorneys as they existed at the end of the nineteenth century. "The powers and duties of a State's Attorney have never been defined by statute law; they are (except in certain particulars specifically enumerated in the statutes) the

neys have direction. He shall advise and assist the state's attorneys if they so request. He shall appear for the state, the governor, the lieutenant-governor, the secretary, the treasurer, and the comptroller, and for all heads of departments and state boards, commissioners, agents, inspectors, librarian, committees, auditors, chemists, directors, harbor masters, and institutions, in all suits and other civil proceedings, excepting upon criminal recognizances and bail bonds, in which the state is a party or is interested, or in which the official acts and doings of said officers are called in question in any court or other tribunal, as the duties of his office shall require; and all such suits shall be conducted by him or under his direction. When any measure affecting the state treasury shall be pending before any committee of the general assembly, such committee shall give him reasonable notice of the pendency of such measure, and he shall appear and take such action as he may deem to be for the best interests of the state, and he shall represent the public interest in the protection of any gifts, legacies, or devises, intended for public or charitable purposes. All legal services required by such officers and boards in matters relating to their official duties shall be performed by the attorney-general or under his direction. All writs, summonses, or other processes served upon such officers shall, forthwith, be transmitted by them to the attorney-general. All suits or other proceedings by them shall be brought by the attorney-general or under his direction. He shall, when required by either branch of the general assembly, give his opinion upon questions of law submitted to him by either of said branches."

necessary incidents of the office, by force of the common law of this State. The language used in relation to the office has not materially changed since it was first formally established. In 1704 the 'Atturney for the Queen,' [was] required to 'prosecute and implead in the lawe all criminall offenders, and to doe all things necessary or convenient as an atturney to suppress vice and imorallitie.' 4 Colonial Records, 468. In 1730 this Act was passed: 'In each county there shall be one King's Attourney, who shall plead and manage, in the county where such attourney is appointed, in all matters proper, in behalf of our sovereign lord the King.' 7 Colonial Records, 280.

"In 1764, apparently to remove any doubt that the representative of the crown also represented the sovereignty of the Colony, the King's attorneys in the several counties were empowered 'to appear in behalf of the Governor and Company of this Colony in all cases concerning them or brought for or against them in any of the said counties.' 12 Colonial Records, 258. In 1784 it was enacted that . . . 'In each county in this State, there shall be one State Attorney, who shall prosecute, manage and plead in the County where such Attorney is appointed, in all Matters proper for, and in behalf of the State.' Statutes 1786, p. 11. In the Revision of 1821 and of 1838 the same language was used. In 1849 the language was condensed as follows . . . 'The County Court, in each county, shall appoint one attorney for the State, who shall act as attorney in behalf of the State in the county where appointed.' Revision 1849, p. 208. In 1888 the statute reads thus . . . 'A State's Attorney in each county, who shall act therein as attorney in behalf of the State.' General Statutes, § 763.

"It has been uniformly held since 1730 that the office then established carried with it the duty to conduct all criminal prosecutions in the Superior Courts, and the power to institute and carry on in every court having

criminal jurisdiction (unless restrained by some statute) any criminal prosecution within the jurisdiction of the court, and also the power and duty to exercise the common law powers appertaining to the office of the Attorney General,[13] so far as applicable to our system of jurisprudence.

"The power of the State's Attorney to file in the Superior Courts an original information exists by reason of his being invested with common law power of Attorney General, which in this State is greatly enlarged, because we early adopted the policy of filing an information in cases of felonies as well as misdemeanors; and, since the adoption of our Constitution, an information may be filed for every crime not punishable by death or imprisonment for life. It is then the common law of this State that authorizes the State's Attorney to file informations in the Superior Court, both in ordinary criminal prosecutions and in those prerogative writs where he represents as Attorney General the sovereignty of the State. Mandamus and quo warranto were authorized and regulated entirely by the common law until 1821, and to this day it is the common law that authorizes the State's Attorney to represent the sovereignty of the State when those writs are issued on application of the State alone." *State* v. *Keena*, supra, 64 Conn. 214–15; accord *State* v. *Nardini*, 187 Conn. 109, 113–15, 445 A.2d 304 (1982).

The attorney general essentially argues that, in 1899, with the election of the first attorney general, all civil authority to act devolved from the state's attorneys to the office of the attorney general. He offers little support

[13] The reference to the "office of the Attorney General" pertains to the noncriminal common-law powers of the state's attorneys and is not an indication that the office of the attorney general, which subsequently was established in 1897 pursuant to P.A. 191, existed at common law.

for this claim, however.[14] Even if we assume, as the attorney general argues, that the case law reveals that the common-law authority of the state's attorneys over charitable and public gifts devolved to the office of the attorney general, there is no indication that any other common-law powers of the state's attorneys concerning civil matters devolved to the office of the attorney general.

Our case law reveals that the state's attorneys continued to possess and act upon their common-law authority over civil matters following the establishment of the office of the attorney general. For example, the state's attorneys continued to bring mandamus and quo warranto actions after 1897. See, e.g., *Gormley* v. *Panuzio*, 166 Conn. 1, 2, 347 A.2d 78 (1974) (writ of mandamus to compel mayor and assessor of city of Bridgeport to implement property revaluations); *Reed* v. *Risley*, 151 Conn. 372, 373–74, 198 A.2d 55 (1964) (writ of mandamus to compel selectmen of town of Vernon to call special town meeting); *Blodgett ex rel. Bazil* v. *Boardman*, 127 Conn. 475, 477, 18 A.2d 370 (1941) (writ of mandamus to compel secretary of state bar examining committee to issue certificate allowing out-of-state attorney to be admitted to Connecticut bar without examination); *Alcorn ex rel. Hoerle* v. *Thomas*, 127 Conn. 426, 427–28, 17 A.2d 514 (1941) (quo warranto information to determine whether defendant had right to continue acting as school superintendent after expiration of employment contract); *Ullman ex rel. Eramo* v. *Payne*, 127 Conn. 239, 239–40, 16 A.2d 286 (1940) (writ of mandamus to compel enforcement of zoning regulations against nonconforming liquor store); *Com-*

[14] In support of his argument, the attorney general cites to *Wilentz* v. *Hendrickson*, 133 N.J. Eq. 447, 454, 33 A.2d 366 (Ch. 1943), aff'd, 135 N.J. Eq. 244, 38 A.2d 199 (N.J. 1944), and *Commission on Special Revenue* v. *Freedom of Information Commission*, 174 Conn. 308, 319, 387 A.2d 533 (1978).

*ley ex rel. Fitzroy* v. *Trustees of Firemen's Relief Fund,* 122 Conn. 650, 652, 191 A. 729 (1937) (writ of mandamus to compel payment of benefits from firemen's relief fund); *Brown ex rel. Gray* v. *Quintilian,* 121 Conn. 300, 302, 184 A. 382 (1936) (quo warranto information to determine title to office of city health official); *Comley ex rel. Donovan* v. *Lawlor,* 120 Conn. 610, 611, 182 A. 218 (1935) (writs of mandamus to enforce rights to receive pension benefits); *Alcorn ex rel. Hendrick* v. *Keating,* 120 Conn. 427, 430, 181 A. 340 (1935) (quo warranto information to determine whether respondent was legal member of state board of finance and control); *Spencer ex rel. Deuse* v. *Fargo,* 114 Conn. 527, 528, 159 A. 349 (1932) (quo warranto information to determine whether respondent's status as nonelector rendered her election to town school committee invalid); *Cummings ex rel. Eliott* v. *Lake Torpedo Boat Co.,* 90 Conn. 638, 640, 98 A. 580 (1916) (writ of mandamus to compel foreign corporation to allow inspection of its records); *Cummings* v. *Looney,* 89 Conn. 557, 560, 95 A. 19 (1915) (writ of mandamus to compel selectmen of town of Stamford to call special town meeting for purpose of electing individual to fill unexpired term of office of town clerk); *Williams* v. *Cleaveland,* 76 Conn. 426, 428–29, 56 A. 850 (1904) (writ of mandamus to compel probate judge to permit appeal from certain orders). Although Public Acts 1976, No. 76-100, § 3, which is codified as amended at General Statutes § 52-485, abolished "[a]ny common law requirement that the state's attorney participate in any way in an action for mandamus," there is no indication that this common-law authority was transferred to the office of the attorney general.[15]

___

[15] The authority of the office of attorney general to apply for a writ of mandamus is conditioned by those statutes granting him such authority. See General Statutes § 4-197 (attorney general may bring mandamus action in name of state against state agency for violation of any provision of chapter 55 of General Statutes, which concerns confidentiality of personal data); General Statutes § 7-577 (authorizing attorney general to apply for writ of

Additionally, the office of the state's attorney continues to represent the commissioner of correction in habeas corpus proceedings, which are civil proceedings[16] through which habeas petitioners challenge the legality of their sentences.[17] See, e.g., *Connelly* v. *Commissioner of Correction*, 258 Conn. 374, 375–76, 780 A.2d 890 (2001) (opposing challenge to imposition of prison sentence on ground that it was product of judicial vindictiveness); *Cobham* v. *Commissioner of Correction*, 258 Conn. 30, 37, 779 A.2d 80 (2001) (opposing challenge to legality of prison sentence); see also *Consiglio* v. *Warden*, 153 Conn. 673, 674, 220 A.2d 269 (1966) (opposing challenge to increase in original sentence by sentence review division of Superior Court on ground that state failed to provide petitioner with counsel at sentence review hearing); *Perell* v. *Warden of State Prison*, 113 Conn. 339, 340, 155 A. 221 (1931) (opposing habeas petition alleging unlawful confinement on ground of insufficiency of evidence); *Ross* v. *Crofutt*,

mandamus on behalf of municipal finance advisory commission to compel municipality "to carry out and give effect to any determination of the commission authorized by [statute]").

[16] E.g., *Collins* v. *York*, 159 Conn. 150, 153, 267 A.2d 668 (1970) ("[h]abeas corpus is a civil proceeding").

[17] The office of the attorney general historically has represented the commissioner of correction in those habeas corpus proceedings in which the petitioner challenges the conditions of his confinement or the commissioner's calculation or denial of credit applicable to the petitioner's term of incarceration. See, e.g., *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 860, 792 A.2d 774 (2002) (opposing challenge to commissioner's calculation of presentence confinement and presentence good time credit); *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 401, 780 A.2d 903 (2001) (opposing challenge to commissioner's decision to deny petitioner credit for time served in mental health facility pursuant to commitment order issued as consequence of petitioner's insanity acquittal); *Santiago* v. *Commissioner of Correction*, 39 Conn. App. 674, 680, 667 A.2d 304 (1995) (opposing challenge of habeas petitioners to commissioner's designation of petitioners as high security risk and resulting loss of recreational, school and work privileges); see also *Sanchez* v. *Warden*, 214 Conn. 23, 24, 570 A.2d 673 (1990) (opposing challenge to prison warden's refusal to allow habeas petitioners access to radios with sound emitting speakers).

84 Conn. 370, 374, 80 A. 90 (1911) (opposing challenge to legality of petitioner's detention pending extradition to New York).

We also are mindful of the numerous statutes, some of which predate the establishment of the office of the attorney general, that authorize state's attorneys or the office of the state's attorney to act upon particular civil matters. For example, General Statutes (1902 Rev.) § 3461[18] authorized state's attorneys to obtain injunctions against troubled financial institutions within their respective counties.[19] Pursuant to General Statutes §§ 7-22[20] and 7-81,[21] state's attorneys possess the authority

[18] General Statutes (1902 Rev.) § 3461 provides in relevant part: "When in the opinion of the bank commissioners the charter of any bank, savings bank, or trust company shall be forfeited, or the public is in danger of being defrauded by any bank, savings bank, or trust company, said commissioners, or the state's attorney in the county in which such bank, savings bank, or trust company is situated, shall prefer a complaint to the superior court for such county, if in session, or if not, to a judge of the supreme court of errors, praying that such bank, savings bank, or trust company may be enjoined from any further proceedings in its business . . . ."

[19] The power to obtain injunctions against financial institutions has since been transferred to the commissioner of banking pursuant to General Statutes § 36a-220.

[20] General Statutes § 7-22 provides in relevant part: "Whenever complaint in writing is made to the state's attorney for any judicial district that the town clerk of any town in such judicial district is guilty of misconduct, wilful and material neglect of duty or incompetence in the conduct of his office, such state's attorney shall make such investigation of the charges as he deems proper and shall, if he is of the opinion that the evidence obtained warrants such action, prepare a statement in writing of the charges against such town clerk, together with a citation in the name of the state, commanding such town clerk to appear before a judge of the Superior Court at a date named therein and show cause, if any, why he should not be removed from office as hereinafter provided. . . . If, after a full hearing of all the evidence offered by the state's attorney and by and in behalf of the defendant, such judge is of the opinion that the evidence presented warrants the removal of such town clerk, he shall cause to be prepared a written order to that effect . . . ."

[21] General Statutes § 7-81 provides in relevant part: "Whenever complaint in writing is made to the state's attorney for any judicial district that the town treasurer . . . is guilty of misconduct, wilful and material neglect of duty or incompetence in the conduct of his office, such state's attorney

to file an action in the Superior Court seeking the removal of town clerks and town treasurers, respectively, in circumstances of misconduct, neglect of duty or incompetence. General Statutes § 16-280f[22] authorizes state's attorneys, on behalf of the department of public utility control, to seek a restraining order or an injunction against any person who violates federal and state safety standards with respect to the storage and transportation of certain gases. Furthermore, General Statutes § 19a-346[23] authorizes state's attorneys to institute an action to enjoin a public nuisance, and General Statutes § 21a-259[24] vests state's attorneys with the

shall make such investigation of the charges as he deems proper, and shall, if he is of the opinion that the evidence obtained warrants such action, prepare a statement in writing of the charges against such town treasurer, together with a citation in the name of the state, commanding such town treasurer to appear before a judge of the Superior Court at a date named therein and show cause, if any, why he should not be removed from office as hereinafter provided. . . . If, after a full hearing of all the evidence offered by the state's attorney and by and in behalf of the defendant, such judge is of the opinion that the evidence presented warrants the removal of such town treasurer, he shall cause to be prepared a written order to that effect . . . ."

[22] General Statutes § 16-280f provides in relevant part: "(a) The Superior Court shall have jurisdiction to restrain violations of sections 16-280a to 16-280g, inclusive, or to enforce standards established under the federal act upon petition of the appropriate state's attorney, upon complaint of the Department of Public Utility Control. . . ."

[23] General Statutes § 19a-346 provides in relevant part: "Whenever a nuisance is kept or maintained, as defined in this chapter, the state's attorney for the judicial district in which such nuisance is located or any citizen of such judicial district may maintain an action in the Superior Court in the name of the state, upon the relation of such state's attorney or citizen, to perpetually enjoin any such nuisance and the person or persons conducting or maintaining the same from continuing the same and the owner or agent of the building or ground upon which such nuisance exists from permitting such building or ground or both to be so used. . . ."

[24] General Statutes § 21a-259 provides in relevant part: "(a) As used in this section, 'rental housing property development' means any privately owned multifamily dwelling consisting of not less than six units which are not owner-occupied and which has at least one unit available for rent. Any store, shop, warehouse, dwelling house, building, rental housing property development, vehicle, boat, aircraft or any place whatever, other than as authorized by law, which is frequently resorted to by drug-dependent persons

authority to institute an action for the appointment of a receiver of rents against the owner of rental property "deemed a common nuisance." Pursuant to General Statutes § 13b-305,[25] a state's attorney may bring an action against a railroad company in order to remedy the railroad company's failure to carry out its contractual duties to construct, maintain or repair a highway or bridge.[26] In light of the foregoing statutes and case law, which make clear that state's attorneys continue to possess and have acted upon their statutory and common-law authority over civil matters long after passage of P.A. 191 in 1897, we reject the attorney general's claim that the common-law authority of state's attorneys over civil matters devolved to the office of the attorney general.

for the purpose of using controlled substances or which is used for the illegal keeping or selling of the same, shall be deemed a common nuisance.

"(b) Any such rental housing property development deemed a common nuisance under subsection (a) of this section may be subject to an action for private receivership by the Chief State's Attorney, a deputy state's attorney, a state's attorney or an assistant or deputy assistant state's attorney on behalf of all the tenants occupying such development by applying to the superior court for the judicial district in which the property is situated for an order requiring the owner and any mortgagees or lienors of record to show cause why a receiver of rents, issues and profits should not be appointed and why said receiver should not remove or remedy such common nuisance and obtain a lien in favor of such tenants, having priority with respect to all existing mortgages or liens, to secure payment of the costs incurred by the receiver in removing or remedying such common nuisance. . . ."

[25] General Statutes § 13b-305 provides in relevant part: "When any railroad company neglects to construct any highway or bridge which it is its duty to construct, or to keep in repair any bridge, embankment, filling or abutment which it is its duty to maintain, the state's attorney . . . shall make complaint thereof to the superior court for such judicial district, and further proceedings shall thereupon be taken against such company, similar to those required against a town neglecting to construct a road laid out by the Superior Court or to keep in repair a road within its limits which it is its duty to construct or keep in repair."

[26] The authority of the state's attorneys to institute an action against a railroad company predates the establishment of the office of the attorney general. See General Statutes (1875 Rev.) title 17, c. 2, pt. 9, art. 2, § 46.

B

The attorney general next argues that this court repeatedly has recognized his common-law authority with respect to the protection of charitable and public gifts, and that this recognition is an indication of his broader common-law authority to bring an action against the defendant under the circumstances of this case. In support of his argument, he cites to several decisions of this court, which, as our ensuing analysis indicates, are inapposite.[27]

In *Healy* v. *Loomis Institute*, 102 Conn. 410, 419, 128 A. 774 (1925), we considered whether the Superior Court had authority, pursuant to its equitable powers, to prevent the trustees of a private school from discontinuing its educational programs for female students. The school was endowed and incorporated by five siblings, all of whom agreed to bequeath their respective estates for the purpose of establishing the school. Id., 415. The attorney general brought an action to enforce the terms of the charter[28] that the siblings had obtained to carry out their compact and pursuant to which the trustees were required to furnish an education to qualifying students between the ages of twelve and twenty-one regardless of sex. Id. On appeal, the attorney general challenged the trial court's finding that the charter did not require the school to continue coeducational instruction and its ensuing conclusion that it should not interfere with the decision of the school's trustees

[27] The attorney general also refers us to several cases from other jurisdictions in support of his claim. In light of the unique history of the office of the attorney general and the fact that the attorney general's authority must be rooted in the common law or statutory law of this state, resort to the case law of other jurisdictions is unhelpful to our resolution of the attorney general's claim.

[28] The charter provided that the school would "furnish free and gratuitous instruction for 'all persons' between the ages of twelve and twenty-one [years] . . . [who] possess[ed] certain educational qualifications." *Healy* v. *Loomis Institute*, supra, 102 Conn. 415.

to discontinue instruction to female students. See id., 416, 419. Conversely, the trustees of the school argued that the trial court lacked jurisdiction to restrain and direct them with respect to the management and control of the internal affairs of the school, including their decision to discontinue coeducational instruction. Id., 419.

We rejected the trustees' argument and concluded that, "if the trustees do not pursue the objects of the charity, or abuse the charity by violating its franchises, its charter or Act of incorporation, or the conditions attached to it, or by the perversion of its funds, the court of chancery will intervene and compel the trustees to establish or execute the trust in accordance with their power under the charter or Act of incorporation and in accordance with the law of the land. The Attorney-General is the proper person to have brought this action, and the bill in equity a proper remedy." Id., 422–23. We did not determine, as the attorney general suggests, that the attorney general's standing to pursue the action rested on any common-law authority inherent in his office. We merely concluded that the Superior Court had jurisdiction to determine the matter and that the attorney general was the appropriate party to bring an action seeking to enforce the proper use of the charitable bequests as reflected in the wills and the charter. See id. Because of the procedural posture of the appeal, we did not address whether the attorney general derived his authority from statutory law or common law.[29]

In *Averill* v. *Lewis*, 106 Conn. 582, 138 A. 815 (1927), a case decided two years after our decision in *Healy*, we concluded that "the beneficiary class [of a public charity] should be represented and their interests protected by the trustees, or, upon their failure to act, then

---

[29] We note, however, that *Healy* was decided twenty-eight years after the attorney general was vested with statutory authority over gifts, legacies and devises intended for charitable and public purposes. See P.A. 191, § 2.

by the public attorney—formerly the State's Attorney and now the Attorney General." Id., 591. In so concluding, we specifically cited General Statutes (1918 Rev.) § 170, now codified as amended at § 3-125, as the source of the attorney general's authority to represent the interests of the beneficiary class. *Averill* v. *Lewis*, supra, 592 ("the Attorney General . . . shall represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes" [internal quotation marks omitted]), quoting General Statutes (1918 Rev.) § 170. We specifically noted that the attorney general's duty to represent the public interest in protecting gifts, legacies or devises intended for charitable purposes "devolve[d] upon [him] by statute"; *Averill* v. *Lewis*, supra, 593; and that such a duty was "mandatory and specific" under the statute. Id., 592.

Approximately five years ago, in *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport*, 243 Conn. 1, 16, 699 A.2d 995 (1997), we determined that a donor does not have standing under the Connecticut Uniform Management of Institutional Funds Act, General Statutes § 45a-526 et seq., to bring an action to enforce the terms of a completed charitable gift. Notwithstanding our reference to the case law of other states in discussing the general common-law rule that attorneys general have authority to enforce the terms of a charitable gift; *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport*, supra, 6–7; we reiterated that "Connecticut is among the majority of jurisdictions that have codified this common-law rule and has entrusted the attorney general with the responsibility and duty to represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes. . . . General Statutes § 3-125." (Internal quotation marks omitted.) *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport*, supra, 7 n.3. Thus, rather than recognize any common-law authority of the

attorney general to protect charitable gifts, we consistently have recognized—albeit at times sub silentio—that the common-law authority heretofore vested in the state's attorneys; see *State* v. *Keena*, supra, 64 Conn. 215 (state's attorneys possess "common law powers appertaining to the office of Attorney General, so far as applicable to our system of jurisprudence"); was codified and transferred to the office of the attorney general upon establishment of that office in 1897. See, e.g., *Averill* v. *Lewis*, supra, 106 Conn. 591–92 (former duty of state's attorney to act on behalf of beneficiaries of public charity now statutory duty of attorney general). We, therefore, reject the attorney general's contention that we previously have recognized common-law authority in his office.

## C

We need not tarry on the attorney general's remaining two arguments, namely, that the legislature repeatedly has recognized and affirmed through legislative enactments that he possesses common-law authority over civil matters and that there will be no effective remedy for addressing the defendant's self-dealing if the attorney general can only proceed pursuant to his authority under § 3-125. The attorney general's first argument rests wholly on several saving clauses found in various statutes. See General Statutes §§ 19a-486h, 21a-225, 36a-647, 42-110m, 42-150, 47-112 and 47a-21. None of these statutes confers upon the attorney general any common-law authority. Cf. *Moore* v. *Ganim*, 233 Conn. 557, 670, 660 A.2d 742 (1995) (*Berdon, J.*, dissenting) (common law of Connecticut includes, inter alia, adjudication of courts of justice, rules of practice and universally accepted usages and customs). Rather, each statute provides that the provisions of the chapter of which the statute is a part "shall [not] be construed as a limitation upon the power or authority of the state . . . [or] the Attorney General . . . to seek administrative, legal

or equitable relief as provided by other statutes or at common law." General Statutes § 21a-225; accord General Statutes §§ 36a-647 (d), 42-110m (b), 42-150, 47-112 and 47a-21 (*l*).[30] We, therefore, find this argument to be without merit.[31]

Notwithstanding the attorney general's argument that the defendant's alleged self-dealing will go unremedied unless we recognize his common-law authority to bring an action against the defendant, we identify several avenues for addressing the defendant's alleged breach of her fiduciary duties. First and foremost, the attorney general may bring an action pursuant to § 3-125[32] and

[30] General Statutes § 19a-486h similarly provides in relevant part that "[n]othing in sections 19a-486 to 19a-486h, inclusive, shall be construed to limit: (1) The common law or statutory authority of the Attorney General . . . ." The attorney general played a substantial role in drafting the legislation governing the sale of nonprofit hospitals; see General Statutes §§ 19a-486 through 19a-486h; of which the foregoing provision is a part. See Conn. Joint Standing Committee Hearings, Public Health, Pt. 5, 1997 Sess., p. 1743.

[31] We note that the attorney general's arguments in the present case may be viewed as inconsistent with his remarks before the public health committee on March 11, 1997. In support of proposed legislation governing the sale of nonprofit hospitals, the attorney general stated that his "office has authority over the charitable assets of [nonprofit hospitals], but [that its] jurisdiction doesn't extend to the merger or acquisition as a whole in the fairness of the evaluation of all the other assets." Conn. Joint Standing Committee Hearings, Public Health, Pt. 5, 1997 Sess., p. 1616. The attorney general also stated that his office did not "have the authority, as this bill [would confer] to look at all the other assets, which may have an equally important community interest and a vital health care interest." Id., p. 1617. The attorney general further remarked: "We can insist that those assets resulting from a donation, or a bequest or some other charitable gift are used for the purposes set forth by the donors. Whether it's [an Internal Revenue Code §] 501 (c) (3) [institution] or any other institution.

"But we can't, we don't have authority over all the other assets, which may have been given or may have been earned during the course of the life of that institution. And we don't have any authority to enforce federal law, we don't have authority to intervene to enforce the fiduciary duty of the board." Id., p. 1620.

[32] General Statutes § 3-125 provides in relevant part: "The Attorney General . . . shall appear . . . for all heads of departments and state boards [and] commissioners . . . in all suits and other civil proceedings . . . in which the state is a party or is interested . . . ."

General Statutes § 10-66ee (g),[33] on behalf of the commissioner of education, to compel the repayment of state funds that the academy used in a manner inconsistent with the provisions of General Statutes § 10-66aa et seq. and to enforce the covenants in the grant documents. Pursuant to General Statutes § 33-1038 (b) (3),[34] the attorney general may also institute an action to dissolve the academy, a nonstock corporation, or to enjoin it from engaging in ultra vires acts. Additionally, the academy itself or its directors may bring an action against the defendant pursuant to § 33-1038 (b).[35] The academy may also seek a court order to remove the defendant as an officer of the nonstock corporation pursuant to General Statutes § 33-1090,[36] or it may institute a private action against the defendant for her alleged wrongdoing.

## II

Our analysis of the attorney general's claim does not end there, however. We still must examine P.A. 191, which established the office of the attorney general and

---

[33] General Statutes § 10-66ee (g) provides: "If the commissioner [of education] finds that any charter school uses a grant under this section for a purpose that is inconsistent with [sections 10-66aa through 10-66gg], the commissioner may require repayment of such grant to the state."

[34] General Statutes § 33-1038 (b) provides in relevant part: "A corporation's power to act may be challenged . . . (3) in a proceeding by the Attorney General to dissolve the corporation or to enjoin the corporation from the conduct of unauthorized affairs."

[35] General Statutes § 33-1038 (b) provides in relevant part: "A corporation's power to act may be challenged . . . (2) in a proceeding by the corporation, directly, derivatively or through a receiver, trustee or other legal representative, against an incumbent or former director, officer, employee or agent of the corporation . . . ."

[36] General Statutes § 33-1090 provides in relevant part: "(a) The superior court for the judicial district where a corporation's principal office . . . is located may remove a director of the corporation from office in a proceeding commenced . . . by the corporation . . . if the court finds that (1) the director engaged in fraudulent or dishonest conduct or gross abuse of authority or discretion, with respect to the corporation and (2) removal is in the best interest of the corporation. . . ."

defined its duties, in order to determine whether the legislature intended to transfer the common-law authority of the state's attorneys over civil matters to the office of the attorney general. We initially examine the landscape upon which the act was passed, however.

The office of the attorney general principally was established in response to the spiraling legal costs incurred by the various state departments. See Hartford Daily Courant, May 15, 1897, p. 12. Prior to the establishment of the office of the attorney general, each state agency and department had retained its own legal counsel to represent it, and thus the state, in legal matters pertaining to the respective agency or department. See id. According to the sponsor of the legislation establishing the office of the attorney general, the comptroller and nine state departments, boards and commissions collectively incurred at least $15,000 in legal expenses in 1896. Id. Representative Harry E. Back estimated that the legal expenses of all of the state departments amounted to $25,000 annually. Id. Representative Samuel Frisbie best summarized the purpose behind the proposed legislation when he stated: "I know of no single better way for saving money than the creating of this office." (Internal quotation marks omitted.) Id.; see also Hartford Daily Times, May 21, 1897, p. 3 (claiming that creation of office of attorney general would result in decrease in legal expenses of state departments).

Additionally, the legislature was concerned that the state was losing money because it did not have an attorney who could represent its financial interests before the legislature and Probate Court. See Hartford Daily Courant, May 15, 1897, p. 12 (discussing proposed legislation concerning East Hartford bridge pursuant to which state would incur $500,000 in expenses and that only attorney appearing in opposition was hired by and acting on behalf of Litchfield county); see also

Hartford Daily Courant, May 21, 1897, p. 6 (discussing lack of representation in connection with state's loss of charitable bequest of $75,000 under will of Philip Marett); cf. *State* v. *Blake*, 69 Conn. 64, 74, 36 A. 1019 (1897) (only legislature was authorized to accept bequest of Philip Marett on behalf of state). In effect, although the state's attorneys were obligated to represent the state's interests in their respective counties; see General Statutes (1887 Rev.) § 763; no one state's attorney was responsible for appearing on behalf of the governor or other state officers, departments, boards or commissions, in various matters of significance to the state.

Mindful of the principal purpose behind the establishment of the office of the attorney general, we now turn to the language of P.A. 191, § 2, to determine whether the legislature intended to transfer the common-law authority of the state's attorneys over civil matters to the office of the attorney general.[37] Public Act 191, § 2, provides in relevant part: "The attorney-general shall have general supervision over all legal matters in which the state is an interested party, *except those legal matters over which the state's attorneys have direction.* He shall advise and assist the state's attorneys if they so request. He shall appear for the state, the governor, the lieutenant-governor, the secretary, the treasurer, and the comptroller, and for all heads of departments and state boards, commissioners, agents, inspectors, librarian, committees, auditors, chemists, directors, harbor masters, and institutions, in all suits and other civil proceedings, excepting upon criminal recognizances and bail bonds, in which the state is a party or

---

[37] "In interpreting the language of a statute, the words must be given their plain and ordinary meaning and their natural and usual sense unless the context indicates that a different meaning was intended." (Internal quotation marks omitted.) *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, 238 Conn. 273, 278, 679 A.2d 347 (1996).

is interested, or in which the official acts and doings of said officers are called in question in any court or other tribunal, as the duties of his office shall require; and all such suits shall be conducted by him or under his direction. When any measure affecting the state treasury shall be pending before any committee of the general assembly . . . he shall appear and take such action as he may deem to be for the best interests of the state, and *he shall represent the public interest in the protection of any gifts, legacies, or devises, intended for public or charitable purposes.* . . . He shall, when required by either branch of the general assembly, give his opinion upon questions of law submitted to him by either of said branches."[38] (Emphasis added.)

[38] Subsequent to the enactment of P.A. 191, the legislature has expanded the attorney general's duties under § 3-125 and through additional legislative enactments. See, e.g., General Statutes § 3-126 (authorizing attorney general to investigate and, with approval of governor, to take action to protect interstate watercourses); General Statutes § 3-127 (with approval of governor, and in name of state, attorney general authorized to negotiate with other states concerning use, allocation or diversion of interstate watercourses); General Statutes § 3-129a (authorizing attorney general to institute civil proceedings to suppress criminally operated corporations); General Statutes § 3-129b (authorizing same with respect to criminally operated unincorporated businesses); General Statutes § 3-129c (authorizing attorney general to bring parens patriae action with respect to imposition of New York City commuter income tax); General Statutes § 3-130 (authorizing attorney general to institute legal proceedings against common carriers to obtain reasonable rates when directed by governor); General Statutes § 14-65k (b) (attorney general, at request of commissioner of motor vehicles, may apply in name of state for temporary and permanent restraining orders to prevent violations of General Statutes §§ 14-51 through 14-65j); General Statutes § 14-327e (d) (attorney general, at request of commissioner of motor vehicles, may obtain temporary and permanent restraining orders to prevent violations of General Statutes §§ 14-327a through 14-327e); General Statutes § 20-341x (b) (attorney general, at request of commissioner of consumer protection, may apply in name of state for temporary and permanent restraining orders to enjoin contractors from violating General Statutes §§ 20-341s through 20-341bb); General Statutes § 31-274g (authorizing attorney general to bring action in name of employment security division of department of labor to collect unemployment contributions and interest legally owed to state).

Pursuant to the clear and unambiguous language of the act, the attorney general's authority specifically excludes *"those legal matters over which the state's attorneys have direction."* (Emphasis added.) Id.; cf. General Statutes § 3-125 ("[t]he Attorney General shall have general supervision over all legal matters in which the state is an interested party, except those legal matters over which the prosecuting officers have direction"). If the attorney general's authority excludes all matters over which the state's attorneys had authority in 1897 and the state's attorneys had various common-law (and statutory) authority with respect to all criminal as well as certain civil matters at that time; see *State* v. *Keena,* supra, 64 Conn. 214–15; it necessarily follows that the state's attorneys were not divested of their common-law authority over civil matters by virtue of the establishment of the office of the attorney general. This conclusion is further supported by the fact that the state's attorneys continued to represent the state in civil matters after 1897; see part I A of this opinion; and the fact that the legislature did not materially alter the statute governing the general duties of the state's attorneys after it created the office of the attorney general. Compare General Statutes (1887 Rev.) § 763 ("[s]aid judges . . . shall also appoint a State's Attorney in each county, who shall act therein as attorney in behalf of the State") with General Statutes (1902 Rev.) § 471 ("[t]he judges of the superior court shall appoint a state's attorney for each county, who shall act therein as attorney in behalf of the state").

Notwithstanding the absence of any indication in the language of P.A. 191, § 2, that the common-law authority of the state's attorneys devolved to the office of the attorney general, that act did transfer to the office of the attorney general the common-law authority of the state's attorneys to represent the public interest in the protection of public and charitable gifts, legacies and

devises. In light of the exclusionary language of the act, and in reliance on the principle of inclusio unius est exclusio alterius, we conclude that the office of the attorney general possesses only that common-law authority previously held by the state's attorneys that the legislature has transferred to that office by way of legislation.[39] See, e.g., *State* v. *White*, 204 Conn. 410, 424, 528 A.2d 811 (1987) ("[a]n enumeration of powers in a statute is uniformly held to forbid things not enumerated" [internal quotation marks omitted]).

We, therefore, agree with the trial court that the office of the attorney general is "a creature of statute" that is governed by statute and, thus, has no common-law authority.[40] Accordingly, we conclude that the trial court properly determined that the attorney general is without standing to pursue an action against the defendant to the extent that the attorney general seeks to remedy the defendant's alleged misappropriation of noncharitable receipts of the academy.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[39] Those who were elected to the position of attorney general in the years immediately following the establishment of the office of the attorney general reached the same conclusion as we do today. See Eighth Biennial Report of the Attorney-General (1915) p. 8 (after detailing statutory duties of his office, attorney general stated that "[t]hese are all of the duties and powers of the Attorney-General enumerated in the statute, and it has been uniformly held that such enumeration of duties and powers forbid[s] the things not enumerated"); cf. Fourth Biennial Report of the Attorney-General (1907) p. 51 ("The duties of the [attorney general's] office are defined in section 146 of the general statutes. . . . So long as [the attorney general] acts within the line of his statutory duties his acts are official.").

[40] In light of our conclusion that the attorney general does not possess common-law authority, we need not address the attorney general's argument that, pursuant to such authority, he may reach all of the assets of a not-for-profit institution. We also do not address this claim in the context of § 3-125, under which the attorney general has statutory authority with respect to the protection of charitable and public gifts, legacies and devises, because the attorney general abandoned his claim under § 3-125 in the trial court.